967 So.2d 735 (2007)
Ronnie Keith WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-857.
Supreme Court of Florida.
June 21, 2007.
As Revised on Denial of Rehearing October 18, 2007.
*741 Carey Haughwout, Public Defender and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
In his first trial, the appellant, Ronnie Keith Williams, was convicted and sentenced to death for first-degree murder. On appeal, this Court reversed the conviction, vacated the sentence, and remanded for a new trial. See Williams v. State, 792 So.2d 1207 (Fla.2001). Williams was retried, and he was again convicted and sentenced to death. For the reasons that follow, we affirm the conviction and sentence.[1]

FACTS AND PROCEDURAL HISTORY
On March 4, 1993, a grand jury indicted Williams on one count of first-degree premeditated murder for the murder of Lisa Dyke. The charges against Williams arose as a result of the death of Dyke nineteen days after she was stabbed multiple times with a knife in a Wilton Manors apartment complex. The evidence presented at trial established the following:
On Tuesday, January 26, 1993, at approximately 8:30 a.m., a call was made to 911 from a woman who identified herself as Lisa Dyke. Dyke stated that she had been stabbed in her heart and back, and she was more than seven months pregnant. When the operator inquired of Dyke as to who stabbed her, she responded with a name that sounded to the operator like "Rodney." Dyke then informed the operator that her attacker was a black male and, although she did not know his last name, she could provide a phone number from which that information could be obtained. Dyke provided the phone number and stated that it belonged to the girlfriend of the man who had stabbed her.
When Dyke opened her door for the police, Officer Brian Gillespie observed an eighteen-year-old black female who was nude, bloody, and wet, "as if she tried to take a shower." Dyke was holding clothing in front of herself in an attempt to cover her nudity. According to Gillespie, Dyke was upset and beginning to lose consciousness. Gillespie observed stab wounds on Dyke's upper torso and back and noticed that there was blood "pretty much everywhere." As she lay on the couch, Dyke stated repeatedly to Gillespie that she did not want to die. While the paramedics were treating Dyke, Gillespie asked who had stabbed her. Through the oxygen mask that covered Dyke's face, and over the sounds of numerous police and paramedic radios, Gillespie heard Dyke say the name "Rodney."[2] When Gillespie asked Dyke who Rodney was, Dyke replied, "Ruth's sister's boyfriend." Dyke gave Gillespie the telephone number of "Ruth's sister." Dyke then made the unsolicited statement to Gillespie, "He raped me." Soon after, the paramedics transported Dyke to the hospital. Hospital personnel were unable to perform a rape examination *742 or collect evidentiary samples for analysis before Dyke was rushed into surgery.
While processing the crime scene, Detective Bob Cerat noticed that there were no signs of forced entry into the apartment. In the bedroom, Cerat discovered a knife that was stained with the same reddish substance that appeared throughout the apartment. Cerat collected the knife, as well as other items from the scene that were stained with the reddish substance. Cerat and another detective lifted or photographed latent fingerprints from the scene.
Detective Anthony Lewis determined that Ruth Lawrence rented the apartment where the stabbing had occurred. He met with Ruth, and she stated that Lisa Dyke had been babysitting Ruth's nine-month-old son in the apartment. Dyke had been living with Ruth for approximately two weeks. Dyke was connected with Ruth because Dyke was dating Ruth's brother, Julius, and Julius was the father of Dyke's unborn baby. The detective discovered that Ruth's sister was named Stefanie Lawrence, and the name of Stefanie's boyfriend was Ronnie Williams. At the time of the attack, Stefanie and Ronnie had been dating for approximately six months. Stefanie lived with her father and Julius, and her telephone number was the number that Dyke provided to police and the 911 operator to identify her attacker. Ruth testified at trial that when she left the apartment that morning to go to school, there was no blood in the apartment where Dyke was found, and Williams had never before bled in her apartment.
Subsequent investigation revealed that on the night before the crime, Ruth had participated in a three-way telephone call with Stefanie and Williams during which Ruth informed Stefanie of a disagreement between Ruth and Williams. Dyke was listening to the conversation on another extension in Ruth's apartment. During that call, Ruth prompted Stefanie to break her relationship with Williams, and Stefanie proceeded to do so during the phone conversation. Stefanie then advised Williams that he was not to return to Ruth's apartment again. According to Stefanie, Williams was upset, and he repeatedly stated that they could resolve the problem. After the call ended, Stefanie did not speak to Williams again, but he paged her four or five times that night. Stefanie did not respond to the pages, and the last page from Williams was around midnight.
Stefanie Lawrence agreed to assist the police in locating where Williams lived. Officer David Jones went to the house identified by Stefanie and encountered Williams's sister, Clinita Lawrence,[3] who informed Officer Jones that she had transported Williams to a mental health crisis facility earlier that day when she noticed that he was acting bizarrely. Officer Jones proceeded to the crisis center and located Williams. Officer Jones observed that Williams had several fresh bandages on both of his hands. Williams was transported to the police station, and Officer Jones advised him of his Miranda[4] rights.
When Dyke regained consciousness after her surgery, she wrote a note to a nurse indicating a desire to speak to the authorities. Detective Daniel James spoke to Dyke in the intensive care unit. Dyke agreed to respond to Detective James's questions by nodding her head for "yes" and moving her head from side-to-side for "no" because she was unable to speak with the tubes which had been placed in her mouth. Detective James produced a photographic *743 lineup of six individuals and asked Dyke if she recognized the person who attacked her. Dyke tapped on the photo of Ronnie Williams with her finger.
At the police station, Williams admitted to Officer Jones that he knew Dyke, but stated that he had not been in Ruth's apartment at the time Dyke was stabbed. With regard to the bandages on his hands, Williams stated that he had cut his fingers on a knife as he was washing dishes. He mentioned that he was having problems with his girlfriend, and that Dyke had been "kind of the go-between person." When Williams was informed that Dyke had identified him as the person who stabbed her, Williams requested an attorney, and the interview was terminated. At that time, Williams was arrested for the attack on Dyke.
On January 28, 1993, when Detective James returned to check on Dyke's condition and to photograph her wounds, he realized that some of the wounds appeared to be bite marks. James photographed bite marks on Dyke's chest, arm, breast, and the back of her shoulder. Dyke also indicated a bite mark in her groin area, but James was unable to photograph that area because Dyke was again taken into surgery to deliver her baby by cesarean section. Dyke died on February 14, 1993, nineteen days after the stabbing.
At trial, forensic pathologist Ronald Wright noted that Dyke had sustained six stab wounds in her back, some of which penetrated her lungs, which caused bleeding into the chest cavity and collapse of the lungs. Further, one stab wound had penetrated Dyke's sternum and was at least four inches deep.[5] Wright opined that the original stab wound would have been deeper, but it was impossible to determine the exact depth because Dyke's wounds had been healing for nineteen days before her death. The doctor noted that Dyke had defensive wounds on her hands and bite marks on her body. Dr. Wright ultimately concluded that the cause of Dyke's death was multiple stab wounds which, over a period of nineteen days, produced a fatally high level of toxicity in Dyke's body.[6] Dr. Wright further reviewed the photos of the cuts on Williams's hands, and concluded that the cuts were consistent with slippage ÔÇö a phenomenon that occurs when a person hits a hard surface (such as a sternum)[7] with a hiltless knife (such as that which was recovered from the apartment), and the hand slides down the knife, producing a cut on the hand of the person holding it.
*744 Fingerprint analyst Fred Boyd testified that a fingerprint found in a reddish substance that was located on the bathroom door of Ruth's apartment matched the known print of Williams's left ring finger. DNA testing on blood samples taken from two pieces of clothing collected from the apartment generated DNA profiles that matched the profile of Williams at four genetic locations. According to a DNA analysis expert, the frequency of occurrence of finding the same profile in two unrelated individuals who matched at four of these points would be one in 120 million African-Americans. Finally, forensic dentist Richard Souviron compared the photographs of the bite mark on Dyke's breast with dental casts made from the mouth of Williams and concluded with reasonable certainty that the bite on Dyke's breast was made by Williams.
At trial, Williams testified that on the night before the stabbing he was upset that Stefanie had severed their relationship. This caused him to begin using drugs, specifically, crack cocaine, powder cocaine, and marijuana. He also consumed a fifth of rum that night. When he started to feel unwell, he went home and lay in bed. The next morning, Williams awoke around 7 a.m. and proceeded to consume a half of a fifth of vodka and use more crack cocaine, powder cocaine, and marijuana in his backyard. Williams testified that between the night prior to the stabbing and the morning of the stabbing, he consumed approximately fifteen rocks of crack cocaine. The last thing he remembered was walking back into his house, and then he awakened in the mental health facility. Williams remembered being brought to the police station and being questioned; however, he had no recollection of the questions asked because he was not feeling well.
Williams's sister, Clinita Lawrence, testified that on the morning of the stabbing, Williams appeared as if he was hallucinating. He was talking nonsensically and had trouble controlling his limbs. Before she went to work, Clinita took Williams to the mental health facility so that he would not hurt himself. Clinita stated that while she was driving to the facility, Williams attempted to exit the car. Clinita testified that upon arrival at the mental facility, Williams attempted to break out of the facility, and he was eventually placed in a straitjacket.
In rebuttal, the State presented the testimony of Michael Elwell, who was director of mental health services in Broward County during 1993. Elwell testified that the mental health facility to which Williams was brought never used straitjackets or anything that resembled a straitjacket. Elwell also stated that, had an individual arrived at the facility hallucinating, incapable of controlling his limbs, and attempting to break out of the facility, the guidelines in place at that time would have required that the individual be medically cleared at a local emergency room prior to admission to the facility.
After hearing all of the evidence, the jury rendered a verdict finding Williams guilty of the murder of Lisa Dyke. The verdict form required the jury to specify the theory of murder upon which it had convicted Williams. The jury indicated that it found Williams guilty of both premeditated murder and felony murder with sexual battery as the underlying felony.
During the penalty phase, the State presented testimony regarding Williams's prior convictions for second-degree murder and indecent assault. With regard to the second-degree murder conviction, Dr. James Ongley testified that in 1984 he worked for the office of the Broward County medical examiner. Dr. Ongley testified that the body of Gaynel Jeffrey was found at a construction site with eight stab wounds in the back and one stab *745 wound in the front. Dr. Ongley concluded that the cause of Jeffrey's death was multiple stab wounds. Robin Jeffrey, who was Gaynel's sister, testified that in 1984, Williams was her boyfriend. Robin testified that on September 11, 1984, she was in the process of severing her relationship with Williams. Williams arrived at the Jeffrey house and attempted to reconcile with Robin. Gaynel informed Williams that he was not to come back to the house or call Robin. The next morning Sybil French, the mother of Gaynel and Robin, found "blood all over" the house in a path that "dragged around" from the front door to the garage. Later that day, French found blood in the backseat of her vehicle.
With regard to Williams's 1982 conviction for indecent assault, retired officer Dennis Edwards testified that at the time of the crime, the victim was nine years old. According to a statement from the victim, Williams came into her residence, forced her into a room, and told her that he would kill her if she did not comply with his commands. Williams then proceeded to penetrate the victim's vagina with his finger, and the victim sustained bleeding as a result of Williams's conduct. The victim stated that at the time of the assault, she was in fear for her life.
The defense presented the testimony of six witnesses at the penalty phase. Arthur Lewis, a lifetime friend of Williams, testified that Williams had difficulty while growing up because of his small stature. According to Lewis, Williams was constantly attacked by the other schoolchildren (earning him the name "the punching bag"), had money taken from him, and was accused of things he did not do. Dorothea Simmons, who counsels individuals in religion, testified that when she counseled Williams in January 1993, she suspected he was on drugs because she had difficulty obtaining his attention. Carter Powell, a corrections deputy with the Broward County Jail, testified that Williams was a model inmate with no disciplinary problems who attended religious services at the jail once a week. Corrections Officer Herman Ruise testified that while incarcerated in the Department of Corrections, Williams was a model prisoner, he was never involved in trouble, and he had amicable relationships with the other inmates.
Williams's sister, Clinita Lawrence, testified that Williams's mother died in childbirth when Williams was seven years old, and that Williams's father was never involved in his life. After his mother's death, Williams went to live with Clinita, who was nineteen years old at the time. Clinita had four other children in her care, one of which was her own child. Clinita stated that she was unable to obtain benefits for the children because she did not have the necessary paperwork to make proper application. For approximately three months, Clinita and the children lived in an abandoned car, and they had to cover themselves with plastic when it rained because the car did not have a roof. Clinita testified that Williams did not do well in school, did not start first grade until he was ten years old, and did not finish high school. She stated that the other children often beat him up and teased him about not having a mother and father. Clinita testified that Williams is "the closest brother that anyone could ever have," and she loves him and depends on him.
Finally, psychologist Dr. Michael Walczak testified concerning Williams's extremely troubled childhood, and concluded that Williams lacked the necessary parental role models to teach him right from wrong. Dr. Walczak concluded that the daily beatings that Williams suffered at the hands of other children were the source of his anger and hostility. Dr. Walczak noted that Williams started using alcohol around the age of eighteen and *746 started using crack cocaine around age twenty. He testified that Williams held a series of jobs, but was fired from them for stealing money to buy drugs. Dr. Walczak opined that it is possible for an individual who consumed ten or fifteen rocks of crack and a fifth of alcohol to have a blackout and to have his or her memory affected. Dr. Walczak ultimately concluded that, at the time of the stabbing, Williams was under the influence of a significant amount of intoxicants and was unable to function normally. He further opined that Williams's capacity to appreciate the criminality of his conduct was substantially impaired in that Williams had no recollection of the stabbing.
After considering the evidence, the jury returned a recommendation of death by a vote of ten to two. After the jury was dismissed, the trial judge informed the parties that he believed that sufficient evidence existed to find the cold, calculated, and premeditated (CCP) aggravator proven beyond a reasonable doubt. The trial court informed the parties that they would have an opportunity to rebut the finding of CCP at the Spencer[8] hearing. At the Spencer hearing, the defense presented no additional evidence, but argued that it would not be proper for the trial judge to consider an aggravator that was never submitted to the jury. The trial court concluded that case law permits a trial court to make findings as to aggravating circumstances where it believes a circumstance has been proven beyond a reasonable doubt. The Court further concluded that Apprendi[9] did not apply because the jury had already made a recommendation of death.
The trial judge sentenced Williams to death for the murder of Dyke. In pronouncing Williams's sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravators: (1) Williams had previously been convicted of a felony involving a threat of violence to the person, see  921.141(5)(b), Fla. Stat. (2003) (great weight); (2) the murder was committed while Williams was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit sexual battery, see  921.141(5)(d), Fla. Stat. (great weight); (3) the murder was especially heinous, atrocious, or cruel, see  921.141(5)(h), Fla. Stat. (great weight); and (4) the murder was cold, calculated, and premeditated, see  921.141(5)(i), Fla. Stat. (moderate weight). The trial court further determined that there was "some" evidence of two statutory mitigating circumstances, that Williams was under extreme mental or emotional disturbance at the time of the crime, see  921.141(6)(b), Fla. Stat., and that the capacity of Williams to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, see  921.141(6)(f), Fla. Stat.; however, the trial court accorded each of these circumstances little weight. The trial court found a total of five nonstatutory mitigating circumstances,[10] each of which the Court assigned *747 slight weight. The trial court concluded:
[S]uch circumstances fail to produce any effect upon the defendant, relative to his character, or relative to the circumstances of his murder of Lisa Dyke. The Defendant's abusive childhood did not vitiate or influence his murder of Lisa Dyke. There is simply no nexus between the adversities of the Defendant's youth, and his vicious and brutal murder of Lisa Dyke. Clinita Lawrence, the sister of . . . Williams was subject to many of the adversities thrust upon the Defendant, and she managed to obtain a college degree and become a productive member of society.
The trial court concluded that the statutory aggravating circumstances were not outweighed by the statutory and nonstatutory mitigating evidence. In imposing a sentence of death, the trial court expressly noted that "the imposition of the sentence in the present case is not contingent upon the Court's finding of the statutory aggravating factor of cold, calculating and premeditated." This direct appeal followed.

ANALYSIS

1. Out-of-Court Statements by Dyke
Williams first claims that the trial court abused its discretion in admitting the out-of-court statements made by Dyke (1) during the 911 call (the 911 statements), (2) to Officer Gillespie (the Gillespie statements), and (3) while in the intensive care unit of the hospital (the hospital statements).[11] Generally, a trial court's *748 ruling on the admissibility of evidence will be upheld absent an abuse of discretion. See Alston v. State, 723 So.2d 148, 156 (Fla.1998). We conclude that these statements were admissible under the concepts of excited utterances or dying declarations as we more fully discuss below.
Excited Utterance.
An excited utterance, which is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is admissible under section 90.803(2) of the Florida Statutes.  90.803(2), Fla. Stat. (2006). Generally, to be admissible under the excited utterance hearsay exception, the out-of-court statement must be made while the declarant is under the stress of the startling event and without time for reflective thought. See Hutchinson v. State, 882 So.2d 943, 951 (Fla.2004). If sufficient time passed for reflective thought, the proponent for admission of the statement must show that reflective thought did not occur. See id.
With regard to the 911 statements, even though Dyke informed the 911 operator that approximately twenty minutes had elapsed after she was stabbed and before the call, the record illustrates that Dyke did not engage in reflective thought. During the 911 call Dyke was crying and in obvious pain, which was consistent with the severe injuries she had suffered. See Rogers v. State, 660 So.2d 237, 240 (Fla. 1995) (holding that statements qualified as excited utterances when declarant was excited and hysterical after time interval in which reflective thought could have occurred).
Williams argues that the fact that Dyke may have attempted to shower demonstrates reflective thought, and, therefore, the 911 statements do not qualify as excited utterances. While this assertion may be arguable, we conclude that it is insufficient to overcome the abuse of discretion standard necessary to overturn the trial court's evidentiary ruling. This Court has stated that "[f]actors that the trial judge can consider in determining whether the necessary state of stress or excitement is present are the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements." State v. Jano, 524 So.2d 660, 661 (Fla. 1988).
Even if Dyke did shower before making the 911 call, it is undisputed that during that time she was suffering from at least seven stab wounds and both of her lungs were punctured. Williams does not assert that during the time period between the stabbing and the 911 call, Dyke's pain from the stab wounds had relented; Dyke had overcome the shock of the stabbing, the biting, or the attempted rape; or that Dyke's fear for her life or the life of her unborn baby had ceased. Therefore, even though it may not be clear as to why Dyke showered (if, indeed, she did shower), we do not believe that the trial court abused its discretion in concluding that Dyke did not "have the reflective capacity necessary *749 for conscious misrepresentation" at the time she called 911. Rogers, 660 So.2d at 240. Additionally, Dyke made the Gillespie statements only minutes after she made the 911 statements. The fact that she was still grievously injured, upset, and fading in and out of consciousness refutes Williams's assertions that Dyke had "the reflective capacity necessary for conscious misrepresentation" at the time she made the Gillespie statements. Id.
Dying Declarations.
A dying declaration is "a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or circumstances surrounding impending death."  90.804(2)(b), Fla. Stat. (2006). For a statement to be admissible under this hearsay exception, the declarant must believe death is imminent and inevitable with no hope of recovery. See Tillman v. State, 44 So.2d 644, 648 (Fla.1950). This Court has held that whether a proper and sufficient predicate has been established for the admission of a statement under the dying declaration hearsay exception is a mixed question of law and fact that is reviewed under a "clearly erroneous" standard. See Teffeteller v. State, 439 So.2d 840, 843-44 (Fla.1983).
During the 911 call, Dyke told the operator that she had been stabbed in the heart and back. She further exclaimed to the operator, "I'm dying," "I can't breathe," and "I can't make it anymore." It is clear from these statements and the circumstances underlying the 911 call that Dyke believed that her death was imminent as a result of the multiple stab wounds she had sustained. Further, by the time the paramedics and the police officers arrived, which was immediately after the 911 call, her condition had not improved. Indeed, it had continued to deteriorate. Gillespie testified that when Dyke opened the door for him, she was beginning to lose consciousness, and her skin was grey. When the paramedics arrived, they gave Dyke oxygen, commenced intravenous fluids, placed Dyke on a heart monitor, and also placed her in a "masked trouser suit," which is an air bladder designed to force blood from the legs into the upper body to increase blood pressure. During her encounter with Officer Gillespie, Dyke expressed that she was afraid of dying. The paramedics even expressed concern to Officer Gillespie that Dyke would not survive. Given these facts and the dire medical circumstances present, we conclude that when Dyke made the Gillespie statements, she feared her death was imminent.
Finally, with regard to the hospital statements, Dyke was very anxious between the time she regained consciousness from general anesthesia and when her statements were made to Detective James. Additionally, even after she made the hospital statements, Dyke expressed to Nurse Walters that she had a fear of dying. Also relevant to Dyke's perception of her imminent death following her surgery is a recognition that she was attached to medical machinery, including a respirator, a heart monitor, and two chest tubes, of which she was clearly aware. Despite supportive attempts by hospital personnel, there is no clear evidence from the record that Dyke believed she had any hope of recovery. Under these facts, we conclude that the admission of the hospital statements as dying declarations was not clearly erroneous. See Teffeteller, 439 So.2d at 843-44.

2. Alleged Departure of Trial Court from a Neutral Stance
Williams asserts that the trial court departed from its position of neutrality three *750 times during Williams's trial: (1) when it issued the order ruling on the admissibility of the out-of-court statements by Dyke before conducting a full hearing to allow the parties an opportunity to present oral argument on the issue; (2) when it determined that the hospital statements were admissible as excited utterances and dying declarations although the State had only asserted that Dyke's statements were admissible as dying declarations; and (3) when it found an aggravating circumstance (CCP) that was not advanced by the State. With regard to the latter two actions, Williams asserts that the trial court abandoned its position of impartiality and acted as prosecutor by adopting bases that were never advanced by the State. Having considered Williams's assertions, we conclude that his allegations of judicial bias are without merit.
With regard to the first challenge, at the hearing on Williams's Motion to Exclude, the trial judge admitted that he had prematurely drafted an order denying the motion. The trial court stated: "You know, maybe I jumped the gun, but I read over all my notes and I thought I had taken it under advisement. . . . I read over all my notes. I read over the motions. I read over your memorandum and I had done an order." However, the trial court informed the parties that he was willing to receive and consider additional arguments. The trial court then proceeded to receive oral arguments from the parties, and, after the arguments concluded, the order denying exclusions was delivered in open court.
A review of the arguments made during this hearing demonstrates that Williams did not object to the entry of an order that was drafted prior to hearing the oral arguments of the parties. This Court has held that "[e]xcept in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court." Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982); see also Spann v. State, 857 So.2d 845, 852 (Fla.2003) ("[T]he specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal."). Therefore, we conclude that even if the claim were meritorious, which it is not, Williams waived his challenge to the prematurely prepared order. The trial court specifically informed the parties that, despite drafting the order earlier, he would listen to the oral presentations and, if he was persuaded, he would be "more than happy" to change the order. Thus, by the judge's own words, he afforded Williams an opportunity to be heard, and the contention that he was denied such an opportunity is without merit.
With regard to the determination that the hospital statements were admissible on a ground not advanced by the State, we conclude that the trial court did not depart from a stance of neutrality and assume the role of prosecutor. We have held that "the trial court's ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling." Muhammad v. State, 782 So.2d 343, 359 (Fla.2001). Thus, if an appellate court can affirm an evidentiary ruling on a basis that was never presented by the parties or relied upon by the trial court, a trial court may base an evidentiary ruling on an alternate basis that was not suggested by the parties.[12] Williams has not presented any authority where this Court has held otherwise. Indeed, *751 the cases upon which Williams relies to support his claim that the trial court departed from neutrality are clearly distinguishable because they involve situations where the trial judge prompted the prosecution to either present certain evidence or take certain actions. See, e.g., Williams v. State, 901 So.2d 357 (Fla. 2d DCA 2005) (court prompted the State during trial to alter allegation in first of two counts of information to fit proof of offense); Evans v. State, 831 So.2d 808 (Fla. 4th DCA 2002) (trial court suggested that prosecution inquire into the immigration status of the defendant); Sparks v. State, 740 So.2d 33 (Fla. 1st DCA 1999) (trial court indicated evidence that prosecution could use for impeachment). Unlike the cases upon which Williams relies, here the trial court did not interject itself into the suppression proceedings. Rather, the trial court read the documents submitted by each party, observed testimony, listened to argument, and ultimately determined that the evidence supported the admission of the hospital statements under two hearsay exceptions. The trial court's conduct was not improper.[13]
Finally, with regard to the trial court finding the CCP aggravator to exist and apply when this aggravator was not advanced by the State, we conclude that the trial court's action was not improper in the abstract.[14] This Court has held that "it is not error for a judge to consider and find an aggravator that was not presented to or found by the jury." Davis v. State, 703 So.2d 1055, 1061 (Fla.1997), cert. denied, 524 U.S. 930, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). In support of this holding, we concluded that "[t]he trial judge . . . is not limited in sentencing to consideration of only that material put before the jury, is not bound by the jury's recommendation, and is given final authority to determine the appropriate sentence." Id. (quoting Engle v. State, 438 So.2d 803, 813 (Fla.1983)). In Hoffman v. State, 474 So.2d 1178 (Fla.1985), this Court, in reaching a similar decision, stated, "We fail to see how the jury's not being instructed on this aggravating circumstance has worked to appellant's disadvantage. . . ." Id. at 1182.[15]
In light of the foregoing, we reject Williams's claim that the trial court departed from a neutral stance.

3. Transcript of the 911 Call
Williams next asserts that the trial court abused its discretion in allowing the jury access to a transcript of the 911 call that was prepared by the State because the transcript improperly editorialized *752 and emphasized portions of the call. Williams further contends that the transcript invaded the province of the jury by suggesting how to interpret certain portions of the tape that are not clearÔÇöfor example, whether Dyke was referring to "Rodney" or "Ronnie" as her attacker. We conclude that this claim is without merit. The standard of review for the use of a demonstrative aid at trial is abuse of discretion. See Chamberlain v. State, 881 So.2d 1087, 1102 (Fla.2004). In Martinez v. State, 761 So.2d 1074 (Fla.2000), this Court, relying upon federal case law, enunciated the procedures to be followed before allowing jurors access to a transcript of a recording:
[T]rial courts should exercise extreme caution before allowing transcripts of recordings to be viewed by the jury. The preferred approach is for the parties to stipulate to the accuracy of the transcript. If there is a dispute as to the accuracy, the trial court should make an independent pretrial determination of the accuracy of the transcript after hearing from persons who can properly testify as to its accuracy. Those who may be able to verify the accuracy of the transcript are: (1) the actual participants to the conversation; or (2) those who listened to or overheard the conversation as it was being recorded, so long as such persons can establish that the quality of the conversation that they overheard or listened to was better at the time they overheard it than the quality of the tape recording.
. . . .
In addition . . . where a transcribed version of an audio-video tape is used as an aid to the jury and there is no stipulation as to its accuracy, trial courts should give a cautionary instruction to the jury regarding the limited use to be made of the transcript. . . . The federal circuits that have considered this issue agree that whenever a transcript is allowed by the trial court, it is "important that the judge instruct the jurors that their personal understanding of the tape supersedes the text in a transcript."
Id. at 1086-87 (quoting United States v. Slade, 627 F.2d 293, 302 (D.C.Cir.1980)).
We conclude that the trial court sufficiently complied with the guidelines announced by this Court in Martinez, and, therefore, no abuse of discretion occurred in allowing the jury to use a transcript of the 911 call. During trial, the 911 operator who received the call from Dyke testified that she had compared the tape with the transcript, and concluded that the transcript was "a fair and accurate transcription of the recording." Thus, the accuracy of the transcript was verified in court by an actual participant to the conversation. See Martinez, 761 So.2d at 1086. Further, because the parties did not stipulate to the accuracy of the transcript, the judge provided the following cautionary instruction to the jury: "State's 41 is in evidence, that is the tape. The transcript is not in evidence. So, if there's a conflict between the transcript that is not in evidence, and the tape that is in evidence, you are to rely on the tape that is in evidence."
This record does not confirm the argument that the trial court abused its discretion in allowing the jury access to a transcript of the 911 call that was created by the State. See Martinez, 761 So.2d at 1086-87.

4. Evidence of Lisa Dyke's Pregnancy
Williams contends that the trial court also abused its discretion in admitting evidence of Lisa Dyke's pregnancy because it was unduly prejudicial in that it could have appealed to passion and could have misdirected the jury in evaluating or weighing the evidence. Although Williams objected at various stages to the admission of this evidence, we conclude that this claim is *753 without merit. The totality of the circumstances became a relevant consideration, and this case also involved a lesser included offense of third-degree felony murder, with Dyke's pregnancy constituting an element of the lesser included offense that the State was required to prove.
Under the Florida Statutes, third-degree felony murder is defined as "[t]he unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate," any felony other than those enumerated in statutory subsection 782.04(4).  782.04(4), Fla. Stat. (1993). Aggravated battery is a second-degree felony that is not enumerated in subsection (4) of section 782.04. See id.;  784.045(2), Fla. Stat. (1993). Under section 784.045 of the Florida Statutes, "[a] person commits aggravated battery if the person who was the victim of the battery was pregnant at the time of the offense and the offender knew or should have known that the victim was pregnant."  784.045(1)(b), Fla. Stat.
Thus, to convict Williams on the lesser included offense of third-degree felony murder, the State was required to prove that (1) Williams battered Dyke, (2) Dyke was pregnant, and (3) Williams knew or should have known that Dyke was pregnant. See id. The third-degree murder aspect of this case essentially placed a burden on the State to prove as an element of the crime that Dyke was pregnant. As a result, Williams cannot claim that he was prejudiced by admission of Dyke's pregnancy into evidence.
Williams unsuccessfully attempted to raise this claim before the trial court when he requested a new jury during the penalty phase on the basis that the guilt phase jury had heard "extensive" evidence of Dyke's pregnancy. When confronted with regard to his specific request for the third-degree felony murder instruction, counsel for Williams stated: "The Court overruled every objection regarding allowing in the pregnancy. And at that point, since [Dyke's pregnancy] was part of the evidence, we had no choice but to ask for that lesser include offense." The trial court countered this assertion by saying:
No, in other words, you requested Third-degree murder, and you knew in advance that one of the elements was that the state had to prove an aggravated battery. And that the homicide occurred during an aggravated battery. And one of the elements of aggravated battery is that . . . the woman was pregnant. So, it seems like you sort of invited that.
We agree that having affirmatively requested a jury instruction on an offense of which the pregnancy of the victim is an element, Williams should not prevail on a challenge to the admission of Dyke's pregnancy during the trial court proceedings.
Moreover, even if Williams had preserved this challenge, we would conclude that the trial court did not err in admitting evidence of Dyke's pregnancy. The Evidence Code provides that "[a]ll relevant evidence is admissible, except as provided by law."  90.402, Fla. Stat. (2006). The Code places the following limitation on the admission of evidence: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."  90.403, Fla. Stat. (2006). The standard of review for a trial court's ruling on the admissibility of evidence is abuse of discretion. See Alston, 723 So.2d at 156.
We conclude that the admission of Dyke's pregnancy was relevant to the totality of the circumstances and to specifically proving the underlying felony in the felony murder charge, attempted *754 sexual battery. The sexual battery statute provides, in pertinent part:
A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony. . . .
 794.011(3), Fla. Stat. (Supp.1992) (emphasis supplied). Under this statute, "the state must prove the victim's lack of consent as an element of the crime." Hodge v. State, 419 So.2d 346, 347 (Fla. 2d DCA 1982). Other states have considered the pregnancy of the victim of a rape to be relevant to the issue of the victim's lack of consent, and we find the rationale of those courts to be persuasive. See, e.g., State v. Burd, 921 So.2d 219, 223 (La.Ct.App.) (concluding that evidence supported conviction of aggravated rape where "[t]he parties were not prior acquaintances; [the victim] was 7-1/2 months pregnant; and [the defendant] confirmed that they first encountered each other by chance only because of her need for a ride home"), review denied, 941 So.2d 35, 35-36 (La. 2006); Justus v. Commonwealth, 220 Va. 971, 266 S.E.2d 87, 93 (1980) (where defendant was charged with murder while in the commission of or subsequent to rape, trial court did not err in allowing evidence of victim's pregnancy where "[t]he advanced state of pregnancy of the victim . . . rendered remote the possibility that the victim would have had intercourse voluntarily with anyone"). At the time of the attack, Dyke was seven months and three weeks pregnant. Further, Williams was not the father of Dyke's child; rather, the father was Julius Lawrence, and Dyke was still in a relationship with Julius at the time of the attack. We conclude that the evidence of Dyke's pregnancy was probative to demonstrate Dyke's lack of consent to any type of sexual conduct with, or sexual advance by, Williams. Accordingly, we deny this claim.[16]

5. Felony Murder/Attempted Sexual Battery
Williams next claims that the trial court erred in submitting a felony murder case with sexual battery or attempted sexual battery as the underlying felony to the jury and by instructing the jury on the aggravating circumstance that the murder occurred during a sexual battery or an attempted sexual battery. Williams further contends that the submission of a first-degree felony murder charge to the jury in this case constituted fundamental error because the statute governing felony murder requires that the death occur during the commission of the underlying felony, and Dyke succumbed to her injuries long after any alleged attempted sexual battery had ended.
*755 With regard to the first challenge, Williams is essentially contending that the trial court erred in failing to grant his motion for judgment of acquittal (JOA) on the felony murder charge. In determining whether a trial court should have entered a JOA rather than submitting a case to a jury, this Court has stated:
If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. However, if the State's evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant's reasonable hypothesis of innocence.
Pagan v. State, 830 So.2d 792, 803 (Fla. 2002) (citation omitted). A motion for JOA should not be granted unless "there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." Gudinas v. State, 693 So.2d 953, 962 (Fla. 1997) (quoting Taylor v. State, 583 So.2d 323, 328 (Fla.1991)). Finally, "[t]he fact that the evidence is contradictory does not warrant a judgment of acquittal because the weight of the evidence and the witnesses' credibility are questions solely for the jury." Fitzpatrick v. State, 900 So.2d 495, 508 (Fla.2005).
Under the Florida Statutes, first-degree felony murder is defined as "[t]he unlawful killing of a human being . . . 2. [w]hen committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any: . . . (c) [s]exual battery. . . ."  782.04(1)(a), Fla. Stat. (1993) (emphasis supplied).[17] To establish the crime of attempt, the State must "prove a specific intent to commit a particular crime and an overt act toward the commission of the crime." Gudinas, 693 So.2d at 962 (quoting Rogers, 660 So.2d at 241). Florida case law demonstrates that various actions satisfy the overt act requirement of an attempted sexual battery charge. In Gudinas, this Court concluded that a trial court properly denied a motion for JOA where there was
undisputed eyewitness testimony that the defendant followed [the victim] and then tried to forcibly enter her car on three separate occasions, including an attempt to smash her window while screaming, "I want to f____ you." Gudinas only ceased his attempt to gain entry to the car when [the victim] "laid on the horn," creating a loud noise.
693 So.2d at 962.
In State v. Ortiz, 766 So.2d 1137, 1142 (Fla. 3d DCA 2000), the Third District reversed the trial court order dismissing a charge of attempted sexual battery where "[t]he victim was found beaten and virtually nude in an isolated wooded area of a park with her shirt pulled up around her head and her shorts down around her ankles." The district court noted that the evidence was "admittedly circumstantial"; however, the court concluded that "the state's substantial and competent evidence in this case is sufficient to establish a prima facie case of guilt against the appellee." Id. at 1142-43; see also Geldreich v. State, 763 So.2d 1114, 1118-19 (Fla. 4th DCA 1999) (affirming denial of JOA motion on attempted sexual battery charge where the defendant "forcibly carried [the victim] to the parking lot, threw her down, straddled her, and began to take her blouse off"); L.J. v. State, 421 So.2d 198, 199 (Fla. 3d DCA 1982) (denying motion to *756 dismiss and noting that an attempted sexual battery "would certainly be facilitated by the overt act of attempting to remove the pants of the victim").
Evidence during this trial revealed there was no sign of forced entry to the apartment where Dyke was found. Therefore, it appears that Dyke voluntarily opened the door for the attacker, and, given her advanced state of pregnancy, it can logically be presumed that she was clothed when she did so. However, when the police arrived Dyke appeared at the door completely nude and was attempting to cover her nudity.[18] Further, when police processed the crime scene, they discovered Dyke's blood-stained shorts and panties on the bed under some bloody sheets in a condition that indicated they were removed either during or in close proximity to the attack. Additionally, Dyke had bite marks on her bare breast and back, and in the general area of her groin. See generally State v. Perea, 142 Ariz. 352, 690 P.2d 71, 76 (1984) (concluding that photograph of bite mark on victim's neck was "probative on the issue of whether a sexual assault had occurred"). Finally, Dyke made an unsolicited statement to Officer Gillespie that she had been "raped."[19] Viewing the totality of these circumstances in a light most favorable to the State, we conclude that there was sufficient evidence upon which a jury could find the existence of the elements of attempted sexual battery beyond a reasonable doubt, and therefore, the trial court did not err in denying the motion for JOA on the felony murder charge.
We further reject Williams's claim that the trial court committed fundamental error in submitting a first-degree felony murder charge to the jury because Dyke did not die during the attempted sexual battery. In cases involving felony murder with sexual battery as the underlying felony, this Court has rejected claims by a defendant that "the murder did not occur `during' the actual sexual battery" and has upheld a felony murder conviction where the murder of one victim and the subsequent kidnapping and sexual battery of another victim "were part of the same criminal episode." Roberts v. State, 510 So.2d 885, 888 (Fla.1987) (citing Jefferson v. State, 128 So.2d 132, 137 (Fla.1961) ("It is a homicide committed during the perpetration of a felony, if the homicide is part of the res gestae of the felony.")). We have further stated that "[n]either the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction when it can be said . . . that the killing is a predictable result of the felonious transaction." Stephens v. State, 787 So.2d 747, 757 (Fla. *757 2001) (quoting Mills v. State, 407 So.2d 218, 221 (Fla. 3d DCA 1981)).
In the instant case, we conclude the trial court properly submitted a felony murder case to the jury because sufficient evidence existed to demonstrate that the stabbing and the attempted sexual battery of Dyke were part of one prolonged criminal episode. See Roberts, 510 So.2d at 888; Pagan, 830 So.2d at 803. Williams obtained a knife from the kitchen of the apartment and used that knife to stab Dyke repeatedly. The bloody knife was subsequently discovered on the floor of the bedroom. Dyke's bloody shorts and underwear were also discovered in the bedroom, on the bed under a sheet. There is no indication from the record that Williams first attempted to sexually batter Dyke, and then made a separate and independent decision to repeatedly stab her. Indeed, the more logical explanation is that the attempted sexual battery and the stabbing were part of one prolonged attack. Further, even though Dyke survived nineteen days after the attack, the trial court did not err in submitting a felony murder case to the jury because death was clearly a predictable result of the multiple stab wounds inflicted to Dyke's chest and back. See Stephens, 787 So.2d at 757. Accordingly, we reject this claim.

6. Premeditation
In his next claim, Williams asserts that the trial court erred in submitting a premeditated murder case to the jury. According to Williams, there is no evidence in the instant case of a plan to kill because Williams did not bring a weapon to the apartment, and there was no sign of forced entry. In further support of this claim, Williams states that no lethal wounds were inflictedÔÇöDyke died from infection, not from the wounds themselves ÔÇö and that had he intended to kill Dyke, she would have died much earlier because there was nothing to stop him from killing her.
As with the felony murder charge, if "a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan, 830 So.2d at 803. With regard to the element of premeditation, this Court has stated:
"Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Premeditation can be shown by circumstantial evidence. Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.

Green, 715 So.2d at 944. Moreover, whether premeditation exists is a question of fact for the jury, but the jury is not required "to believe the defendant's version of the facts when the State has produced conflicting evidence."
Perry v. State, 801 So.2d 78, 84 (Fla.2001) (citations omitted) (quoting Green v. State, 715 So.2d 940, 943 (Fla.1998), and Spencer v. State, 645 So.2d 377, 381 (Fla.1994)). This Court has also held that "[p]remeditation may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Boyd v. *758 State, 910 So.2d 167, 181 (Fla.2005) (internal quotation marks omitted). Further, we have held that "the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation." Perry, 801 So.2d at 85-86.
In the instant case, Doctor Wright testified that Dyke was stabbed in the upper chest and back area no fewer than seven times. One stab wound penetrated her sternum, one of the hardest bones in the body, and entered the pericardial sac that surrounds the heart. Other stab wounds perforated her lungs. Williams unquestionably stabbed Dyke in areas of her body where vital organs were located. See Perry, 801 So.2d at 85-86.
Further, the evidence presented during trial demonstrated that twelve hours before the attack, Stefanie Lawrence terminated her relationship with Williams during a phone call in which both Ruth Lawrence and Dyke participated. The next morning, Williams drove from Fort Lauderdale to Ruth Lawrence's apartment ÔÇö a fifteen-minute drive. There was evidence at trial from which the jury could conclude that Williams approached the apartment in a manner that minimized the possibility of him being seen by the other tenants.[20] There were no signs of pry marks or forced entry to the front door of the apartment, indicating that Dyke, who was babysitting a nine-month-old child, voluntarily admitted the person who entered the apartment. Ruth testified that the knife used was removed from the top of the kitchen sink where it was kept in plain view with other knives in a holder. Evidence presented at trial demonstrated that Williams had been to Ruth's apartment previously, and he had even helped Dyke move into Ruth's apartment only two weeks before. Under these facts, we conclude that there was competent, substantial evidence from which the jury could conclude that Williams possessed "a fully formed conscious purpose to kill." Perry, 801 So.2d at 84. Accordingly, we conclude that the trial court properly submitted a premeditated murder case to the jury.

7. The Indictment
Williams next asserts that the indictment in this case was constructively amended when the trial court instructed the jury on felony murder and the State argued for conviction on a theory of felony murder. Williams contends that the amendment was improper because the grand jury only charged Williams with premeditated murder. Williams also asserts that the trial court erred in allowing the State to proceed on a theory of felony murder where the indictment gave no indication of that theory.
Williams is correct that the indictment charged first-degree premeditated murder, but did not reference felony murder. Nonetheless, we have stated: "It is well established that an indictment which charges premeditated murder permits the State to prosecute under both the premeditated and felony murder theories." Parker v. State, 904 So.2d 370, 382-83 (Fla. 2005). We have further held that "[t]he State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder." Kearse v. State, 662 So.2d 677, 682 (Fla. *759 1995). Similarly, this Court has "repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory." Gudinas, 693 So.2d at 964. Accordingly, these claims are without merit.

8. The Presumption of Innocence
In this claim, Williams asserts that the trial court committed fundamental error by failing to instruct the jury that the presumption of innocence applied to the charge of felony murder. Williams notes that the trial court did instruct the jury that the presumption of innocence applied to the allegations in the indictment; however, felony murder was not alleged in the indictment.
Williams does not dispute that he did not request the trial court to instruct the jury that the presumption of innocence applied to the charge of felony murder. This Court has held that jury instructions "are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred." Walls v. State, 926 So.2d 1156, 1180 (Fla.2006) (quoting State v. Delva, 575 So.2d 643, 644 (Fla. 1991)).
A review of this Court's case law demonstrates that the failure of counsel to request specific additional instructions on the presumption of innocence waives a challenge to those instructions given. In Griffin v. State, 414 So.2d 1025 (Fla.1982), the court instructed the jury on felony murder, but failed to instruct the jury on the elements of the underlying felony, i.e., robbery. See id. at 1027. When the omission was brought to the judge's attention, the judge reinstructed the jurors on felony murder and on the underlying felony of robbery. See id. At that time, defense counsel did not request that the court repeat the instruction on the presumption of innocence as to the crime of robbery. See id. at 1028. On review, this Court concluded that the failure of defense counsel to request a repetition of the instruction on the presumption of innocence as to the robbery charge waived the challenge to the jury instructions that were given. See id. Similarly, we would conclude that the failure here to request a specific instruction on the presumption of innocence with regard to the felony murder charge waived the instant challenge.
Further, even if an additional instruction had been requested, we conclude that the failure to give such an instruction would not constitute error. In McCrae v. State, 510 So.2d 874 (Fla.1987), this Court held in postconviction proceedings that trial counsel was not ineffective for failing to request special additional instructions on the presumption of innocence because "the general standard instructions on the presumption of innocence . . . were sufficient to apprise the jury of the applicable principles." Id. at 878. In the instant case, the trial court read the standard jury instruction regarding the presumption of innocence:
The defendant has entered a plea of not guilty. This means you must presume or believe that the defendant is innocent. The presumption stays with the Defendant, as to each material allegation in the indictment, through each stage of the trial, unless it has been overcome by the evidence, to the exclusion of and beyond a reasonable doubt.
Fla. Std. Jury Instr. (Crim.) 3.7. This instruction was provided after the trial court enumerated the elements of first-degree premeditated and felony murder and each of the lesser included offenses. As noted earlier, an indictment which charges premeditated murder "permits the State to prosecute under both the premeditated and felony murder theories." Parker, 904 So.2d at 382-83. Therefore, even *760 though the standard jury instruction for the presumption of innocence that the trial court read to the jurors referenced "the indictment," we conclude that the trial court's reading of this instruction was "sufficient to apprise the jury of the applicable principles." McCrae, 510 So.2d at 878. Indeed, it would be illogical under these circumstances for the jurors to conclude that the presumption of innocence only applied to the charge of premeditated murder, but not to the charge of felony murder or any of the lesser included offenses. Accordingly, we conclude that this claim is without merit.

9. Unanimity of the Verdict
In his next challenge, Williams claims that the trial court committed reversible error in only instructing the jury that its verdict must be unanimous, but not providing an additional instruction that a conviction on the theory of the murder must be unanimous. A review of the record demonstrates that after the jury had been instructed, but before the jury began to deliberate, the trial court specifically asked the parties, "Other than the objections previously made, are there any objections as to the manner I read the instructions, any instructions that I misread, or any instructions that I said I would give that I neglected to give?" Williams's counsel replied, "No, Your Honor. We would just renew the objections that were previously made. There's no new objection." Williams has waived the current challenge because he failed to object to the jury instructions on this basis, and he failed to request that the court instruct the jury that the theory of the murder must also be unanimous. See Walls, 926 So.2d at 1180. Nonetheless, even if this challenge had been preserved, we would conclude that it is without merit because the United States Supreme Court has held "that the United States Constitution [does] not require the jury to come to a unanimous decision on the theory of first-degree murder." Mansfield v. State, 911 So.2d 1160, 1178 (Fla.2005) (citing Schad v. Arizona, 501 U.S. 624, 645, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)). Moreover, the trial court utilized a verdict form upon which the jury could specify whether it found Williams guilty of premeditated or felony murder, and the jury found Williams guilty under both theories. Accordingly, we reject this claim.

10. Weighing of Aggravating and Mitigating Factors
In his next claim, Williams contends that the trial court erred in failing to instruct the jury that it was required to determine that the aggravators found outweighed the mitigators found beyond a reasonable doubt, rather than by a preponderance of the evidence standard, before it could recommend a penalty of death. Williams further asserts that the trial court erroneously instructed the jury that it was required to determine whether sufficient mitigating circumstances existed that outweighed the aggravating circumstances. According to Williams, such an instruction unconstitutionally created the presumption that a death sentence was appropriate because the burden of persuasion cast upon the defendant was higher to prove that a life sentence was justified than that placed on the State to initially prove that the death penalty was the proper sentence. Finally, Williams claims that the standard jury instruction which provides that the jury is to consider mitigation only if it is "reasonably convinced" of its existence unconstitutionally limits the consideration of mitigating evidence.
As with the guilt phase, during the penalty phase, after instructing the jury but before the jury began to deliberate, the judge asked counsel, "[A]re there any objections to the manner I read the *761 instructions, any instructions I said that I would give, or any instructions that I misread?" Defense counsel mentioned that the court had failed to give an agreed-upon instruction (which the court subsequently read to the jury), but then stated that the "only other objections are to the indecent assault and sexual battery" instructions. We conclude that Williams has waived the current challenge because he failed to object to the jury instructions on this basis. See Walls, 926 So.2d at 1180.
Again, however, even if these objections had been preserved, these challenges to the jury instructions are without merit because this Court has repeatedly rejected the argument that the standard penalty phase jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence. See, e.g., Elledge v. State, 911 So.2d 57, 79 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002). This Court in Sweet further rejected a claim of error where a trial court failed to instruct the jury that "it was required to find beyond a reasonable doubt that the aggravators outweighed the mitigators before recommending a sentence of death." Id. at 1275. Finally, in Bogle v. State, 655 So.2d 1103, 1108 (Fla.1995), we rejected the claim that a jury instruction which provides that a mitigator may be considered if the jury is reasonably convinced of its existence erroneously restricts the evidence that a jury may consider in mitigation. Accordingly, we reject these claims.

11. Required Findings for Imposition of the Death Penalty
In this claim, Williams asserts that the trial court failed to make the required findings for imposition of the death penalty. Section 921.141(3) of the Florida Statutes requires that a trial court sentencing a defendant to death must set forth in writing its findings that sufficient aggravators exist to justify the death penalty and that the mitigators are insufficient to outweigh the aggravators. If these findings are not made within thirty days, a life sentence must be imposed. See  921.141(3), Fla. Stat. (2006). According to Williams, because the trial court's sentencing order does not contain the finding that sufficient aggravators exist to justify a death sentence, but only weighs the aggravators against the mitigators, the trial court is required to impose a life sentence. We disagree.
This Court has stated:
There is no prescribed form for the order containing the findings of mitigating and aggravating circumstances. The primary purpose of requiring these findings to be in writing is to provide an opportunity for meaningful review by this Court so that it may be determined that the trial judge viewed the issue of life or death within the framework of the rules provided by statute. It must appear that the sentence imposed was the result of reasoned judgment.
Holmes v. State, 374 So.2d 944, 950 (Fla. 1979). In its order, the trial court stated that it found four statutory aggravators beyond a reasonable doubt, and it found evidence of two statutory and five nonstatutory mitigators. The trial court also noted that it did not find age to be a statutory mitigator, even though the jury was instructed as to this mitigator, because "Williams was approximately 30 years of age when he murdered Lisa Dyke." Finally, in weighing the aggravators and mitigators, the trial court stated the aggravators were proven beyond a reasonable doubt and were "not outweighed by the statutory and non-statutory mitigating evidence." It is clear from the trial court's order that it found sufficient aggravators existed to justify a death sentence even though it did not make this precise statement in its order. Williams has failed to *762 provide authority in which this Court has vacated a death sentence based on a trial court's failure to include the precise words finding that sufficient aggravators exist to justify a death sentence. Therefore, we conclude that this claim is without merit.

12. Indecent Assault as a Prior Violent Felony
In this claim, Williams asserts the trial court erred in using Williams's conviction for indecent assault as a prior violent felony aggravator. According to Williams, before an offense can qualify as a prior violent felony, violence must be an inherent element of the offense, and violence is not an inherent element of the crime of indecent assault. However, this Court has stated that the finding of a prior violent felony conviction aggravator attaches to life-threatening crimes in which the perpetrator comes in direct contact with a human victim. Further, whether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime. See Rose v. State, 787 So.2d 786, 800 (Fla. 2001). The existence of violence as an "inherent element" is not the test.
This Court has held that lewd and lascivious acts against minors qualify as prior violent felonies, see, e.g., Lawrence v. State, 846 So.2d 440, 455 n. 12 (Fla.2003) (sexual activity with a child and lewd and lascivious assault); Hess v. State, 794 So.2d 1249 (Fla.2001) (lewd assault on a child), and we conclude that the prior indecent assault similarly constitutes a violent felony. According to the testimony of former deputy Edwards, the nine-year-old victim told him that Williams "came into [her] residence, forced her into a room, and put her in fear of her life, by telling her that he would kill her, if she didn't comply with his actions." Williams then penetrated her vagina with his finger, and the victim sustained bleeding as a result of his actions. This testimony demonstrates that violence occurred at least three times during the indecent assault: (1) when he forced her into a room; (2) when he threatened to kill her; and (3) when he penetrated her in a manner that caused her to bleed. Cf. Rose, 787 So.2d at 800-01 (prior violent felony aggravator established where the defendant "entered the victim's apartment in the middle of the night . . . covered her mouth with his hand as he threatened to kill her if she made any noise . . . [and] shoved her to the floor on his way out of the apartment"). Therefore, the trial court properly considered the conviction for indecent assault as a prior violent felony aggravator, and we reject this challenge.

13. HAC Aggravator
Williams contends that the trial court erred in finding the HAC aggravator proven beyond a reasonable doubt because the trial court's finding was based on Dyke's pain and fear. Williams contends that the suffering of the victim is not probative of the HAC aggravator because it does not set the murder apart from the norm of capital felonies. According to Williams, it is the intentional design of the perpetrator to inflict pain which HAC is designed to cover. Since the trial court did not find that Williams had an intentional design to torture or inflict pain, Williams asserts that the finding of this aggravator is improper.
With regard to the HAC aggravator, this Court has stated:
The HAC aggravating factor applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a *763 defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference.
Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002) (citations omitted). "The standard of review applicable to this issue is whether competent, substantial evidence supports the trial court's finding." Conde v. State, 860 So.2d 930, 953 (Fla.2003). In determining whether an aggravator has been proven, this Court has held that "the trial judge may apply a common-sense inference from the circumstances." Gilliam v. State, 582 So.2d 610, 612 (Fla.1991) (internal quotation marks omitted). This Court has also noted that "the fear and emotional strain preceding the death of the victim may be considered as contributing to the heinous nature of a capital felony." Walker v. State, 707 So.2d 300, 315 (Fla. 1997); see also Adams v. State, 412 So.2d 850, 857 (Fla.1982) (noting that the victim was screaming prior to her death and concluding that "[a] frightened eight-year-old girl being strangled by an adult man should certainly be described as heinous, atrocious, and cruel"). Finally, this Court has held that the fact that the attack occurred within the supposed safety of the victim's own home "adds to the atrocity of the crime." Perry v. State, 522 So.2d 817, 821 (Fla.1988).
The trial court's sentencing order provides abundant support for the court's conclusion that Dyke's murder was heinous, atrocious, or cruel:
The evidence reflects that Lisa Dyke suffered great fear, emotional strain, and terror during the events leading up to her death. . . . Williams stabbed Ms. Dyke multiple times in her chest and back, and viciously bit her. . . . [Williams's] actions were designed to inflict unnecessary pain and suffering upon Lisa Dyke.
The repeated stab wounds and bites to [Dyke] by [Williams] coupled with the level of force necessary to penetrate Lisa Dyke's sternum reflects that the murder of Lisa Dyke was a conscienceless and pitiless crime which was prolonged, and was unnecessarily torturous to [Dyke]. The evidence further reflects that Ms. Dyke sustained defensive wounds in an unsuccessful attempt to defend herself against [Williams's] vicious attack. Thus, the defensive wounds support the fact that Ms. Dyke was alive while being repeatedly stabbed by Mr. Williams.
The evidence reflects that Lisa Dyke suffered extreme mental anguish as the result of her anxiety and concern over the state of health of her unborn child following her stabbing by [Williams]. . . .
The murder of Lisa Dyke was committed in such a manner as to cause unnecessary and prolonged suffering of [Dyke]. The evidence reflects that Lisa Dyke languished in the hospital for nineteen days before passing away. During this time, she expressed constant fear of her impending death, and was forced to endure the discomfort and fear of having tubes inserted in her throat, which made it impossible for her to vocally express the level of her pain and suffering. . . . The evidence reflects that Lisa Dyke remained conscious throughout [Williams's] vicious attack upon her, that she was aware of the seriousness of her wounds, and that she was aware of the likelihood of her impending death.
Further evidence that the HAC aggravator existed is in the testimony from Courtney Mylott, who lived in the apartment next door to Dyke and Ruth Lawrence and heard a female in Lawrence's apartment screaming for help for approximately five *764 minutes on the morning of the attack. See also Bates v. State, 750 So.2d 6, 17-18 (Fla.1999) (in concluding that HAC aggravator was proven, Court noted that "[t]he terror and fear experienced by the victim . . . is best evidenced by her scream as vividly described by the phone caller . . . who placed the phone call at precisely the time [the victim] first encountered the Defendant").
We hold that the trial court's finding of the HAC aggravator was proper. Accordingly, we reject this claim.

14. CCP aggravator
Williams also contends that the trial court erred in finding the CCP aggravator to exist. Williams states that CCP ordinarily applies in those murders which are characterized as executions or contract murders, and that heightened premeditation is required. According to Williams, the instant case meets neither the spirit nor the literal requirements for this aggravator. Williams further notes that the killing of Gaynel Jeffrey in an earlier episode was not premeditated because he was only convicted of second-degree murder, which does not include a finding of premeditation. Hence, Williams contends that the trial court erred in using factual allegations from charges of which he had been acquitted to find the existence of this aggravator.
This Court has held that:
To support the CCP aggravator, a jury must find "that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification."
Buzia v. State, 926 So.2d 1203, 1214 (Fla.) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)), cert. denied, ___ U.S. ___, 127 S.Ct. 184, 166 L.Ed.2d 129 (2006). The standard of review for a trial court's ruling on an aggravating factor is whether competent, substantial evidence supports the trial court's finding. See Conde v. State, 860 So.2d at 953. This Court has concluded that "competent substantial evidence" is tantamount to "legally sufficient evidence" and "[i]n criminal law, a finding that the evidence is legally insufficient means that the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt." Almeida v. State, 748 So.2d 922, 932 & n. 20 (Fla.1999) (quoting Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981)).
We agree with Williams that the CCP aggravator is not supported by competent substantial evidence and that the trial court erred in finding and weighing this aggravator. During trial, one theory of the events advanced by the State was that Williams originally traveled to Ruth Lawrence's apartment to only ask Dyke to act as a mediator in his troubles with Stephanie Lawrence, as she had done in the past when the couple had previously experienced difficulties. When Dyke refused to act as mediator, Williams became enraged and attacked her. There is no evidence in the record that refutes this possible theory of the events. Further, the second-degree murder of Gaynel Jeffries committed by Williams eight years earlier fails to demonstrate beyond a reasonable doubt that he formulated a carefully prearranged design to kill Ruth Lawrence or Lisa Dyke in this episode as an act of revenge against Stephanie Lawrence for terminating their relationship. At most, the similarity between these two crimes only demonstrates that Williams does have serious emotional problems, and when he is rejected by a girlfriend, an angry response is triggered which has produced deadly consequences. *765 Williams's earlier murder conviction has no bearing in the instant case except to show that Williams reacts violently to rejection. Accordingly, we conclude that competent substantial evidence does not exist to support the trial court's finding of the CCP aggravator. See Almeida, 748 So.2d at 932 n. 20.
When this Court strikes an aggravating factor on appeal, "the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence." Jennings v. State, 782 So.2d 853, 863 n. 9 (Fla.2001); see also Douglas v. State, 878 So.2d 1246, 1268 (Fla.2004) ("Striking [an] aggravator necessitates a harmless error analysis."). We conclude that the trial court's erroneous finding of the CCP aggravator was harmless because the jury was not instructed with regard to this statutory aggravator, and the trial court expressly stated that its imposition of the death penalty was not contingent on the finding of this aggravator. In light of these facts, there is no reasonable probability that the finding of the CCP aggravator affected the sentence that was imposed in this case.

15. Proportionality
Williams asserts that the imposition of the death sentence for the murder of Lisa Dyke is disproportionate. In reviewing for proportionality, the totality of the circumstances should be considered and the matter should be compared with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This comparison, however, is not simply between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is reserved "only for the most aggravated and least mitigated murders." Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the instant matter, the jury recommended the death penalty by a vote of ten to two. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances against the statutory and nonstatutory mitigating circumstances. Without including a CCP aggravating factor which we have stricken, the trial court found the following three aggravating factors to be proven beyond a reasonable doubt: (1) Williams had previously been convicted of a felony involving a threat of violence, see  921.141(5)(b), Fla. Stat.; (2) Williams committed the capital felony while he was engaged in the commission of, or while attempting to commit, a sexual battery upon Dyke, see  921.141(5)(d), Fla. Stat.; and (3) the killing was especially heinous, atrocious, or cruel, see  921.141(5)(h), Fla. Stat. The court assigned these three aggravators "great" weight. The trial court found "some evidence" of the following statutory and nonstatutory mitigating factors and assigned "slight" or "little" weight to each: (1) the capital felony was committed while Williams was under the influence of extreme mental or emotional disturbance, see  921.141(6)(b), Fla. Stat.; (2) the capacity of Williams to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, see  921.141(6)(f), Fla. Stat.; (3) Williams was a model prisoner in jail; (4) Williams attended religious services in jail; (5) Williams had a deprived childhood and had trouble finding work after previous convictions; (6) Williams was a loving person and a good brother; and (7) Williams was slight in stature, and was frequently beaten and robbed as child.
After reviewing the totality of the circumstances, we conclude that the instant matter is comparable to other capital cases in which this Court has upheld the death penalty. In Spencer v. State, 691 So.2d *766 1062 (Fla.1996), we held the death sentence to be proportionate in connection with a stabbing murder where the trial court found two aggravating factors (prior violent felony and HAC), two statutory mitigating factors (extreme emotional disturbance and impaired capacity to appreciate criminality or conform conduct), and at least six nonstatutory mitigating factors. See id. at 1063-66. In Singleton v. State, 783 So.2d 970 (Fla.2001), a death sentence was also upheld where the defendant stabbed a supine victim as she was calling for help, and the trial court found two aggravating factors (prior violent felony and HAC), three statutory mitigating factors (extreme emotional disturbance, impaired capacity to appreciate criminality or conform conduct, and age), and nine nonstatutory mitigating factors (including drug use at the time of the offense and being a model prisoner). See id. at 972-73, 979. Pope v. State, 679 So.2d 710 (Fla.1996), affirmed a death sentence in another stabbing murder where the trial court found two aggravating factors (prior violent felony and pecuniary gain), two statutory mitigating factors (extreme emotional disturbance and impaired capacity to appreciate criminality or conform conduct), and three nonstatutory mitigating factors (including drug use at the time of the offense). See id. at 713-16. Finally, the death sentence was affirmed in Bates v. State, 750 So.2d 6 (Fla.1999), which was also a stabbing murder, where the trial court found three aggravating factors (the murder was committed during an attempted sexual battery, pecuniary gain, and HAC), two statutory mitigating factors (no history of significant criminal activity and age), and eight nonstatutory mitigating factors (including family background and being a good husband/father). See id. at 9-12.
The instant case is comparable to, and probably even more aggravated than, other cases in which this Court has affirmed the death penalty. Williams bit, repeatedly stabbed, and attempted to rape an eighteen-year-old woman who was almost eight months pregnant in a prolonged attack. The wounds were inflicted to the chest and back in such a manner as to strike major organs in Dyke's body, causing Dyke intense physical and mental pain and suffering. Dyke was conscious throughout the attack, and experienced circumstances that would provoke tremendous fear and terror for herself and her unborn child. Moreover, Williams has convictions for two prior violent felonies, one involving the murder of another woman, and the second involving an indecent assault upon a nine-year-old child, during which he threatened to kill the child if she did not obey his commands.
The case upon which Williams relies to assert that a death sentence is disproportionate is clearly distinguishable. In Terry v. State, 668 So.2d 954 (Fla.1996), we held that the death sentence was disproportionate in connection with a shooting that occurred during what was described as probably a "robbery gone bad," id. at 965, where the trial court found two aggravating factors (prior violent felony and pecuniary gain) and no statutory mitigating factors, and the court rejected the nonstatutory mitigation. See id. at 965-66. In concluding that the sentence there was disproportionate, we reasoned that the circumstances surrounding the shooting were unclear, the aggravation was not sufficiently extensive based on consideration of the totality of the underlying circumstances, and the prior violent felony aggravating factor involved "a contemporaneous conviction as principal to the aggravated assault simultaneously committed by the codefendant . . . who pointed an inoperable gun at [the victim]." Id. at 965. Unlike Terry, the aggravators in the instant matter do not all involve the circumstances of the stabbing. Williams was convicted of two *767 prior violent felonies that occurred before the murder of Dyke. Additionally, the aggravation is greater in this case due to the finding of the HAC aggravator. See Douglas v. State, 878 So.2d 1246, 1262 (Fla.2004) (noting that HAC is "one of the most serious aggravators in the statutory sentencing scheme"). Further, the murder of Dyke is more egregious than that committed in Terry because here there is evidence of a repeated stabbing of a conscious victim. See Hutchinson v. State, 882 So.2d at 963 (noting that a killing is inherently torturous where it involves "a strangulation or repeated stabbing of a conscious victim").
Williams's death sentence is not disproportionate to other capital cases. Accordingly, we uphold the sentence in this case.

16. Constitutionality of the Death Penalty
In his final challenge, Williams asserts that the death penalty in the instant case violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Williams further asserts that Florida's sentencing structure unconstitutionally fails to narrow the category of death-eligible persons as mandated by the United States Supreme Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because a conviction for first-degree murder, without more, makes a defendant eligible for the death penalty in Florida.
This Court has already rejected Williams's assertions in prior decisions, and, therefore, he is not entitled to relief. This Court has held that Florida's capital sentencing scheme does not violate the United States Constitution under Ring. See Jones v. State, 845 So.2d 55, 74 (Fla. 2003). Furthermore, one of the aggravating factors found by the trial court in this case was Williams's prior convictions for two violent felonies, and this is a factor "which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003). Finally, this Court has "rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty." Miller v. State, 926 So.2d 1243, 1260 (Fla.2006) (quoting Lugo v. State, 845 So.2d 74, 119 (Fla. 2003)). Therefore, we reject Williams's challenges as being without merit.

CONCLUSION
For the reasons expressed above, we affirm Williams's conviction and sentence of death.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs with an opinion, in which QUINCE, J., concurs.
ANSTEAD, J., concurs in result only.
PARIENTE, J., concurring.
I concur in the affirmance of Williams' death sentence, and write only to address the implication of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on our precedent that had authorized a trial court to find an aggravator on which the jury was not instructed. As the majority correctly notes, the precedent that allows a trial judge to consider and find an aggravator on which the jury was not instructed and states that a judge is not bound by the jury's recommendation predates the United States Supreme Court's decision in Ring. See majority op. at 751, n. 15; see also Davis v. State, 703 So.2d 1055, 1061 (Fla.1997); Hoffman v. State, 474 So.2d 1178, 1182 (Fla.1985); Engle v. State, 438 So.2d 803, 813 (Fla.1983).
*768 It is clear after Ring that under the Sixth Amendment right to a jury trial, the jury is charged with the responsibility of finding the facts, other than the existence of a prior felony conviction, essential to the imposition of the death penalty. See Ring, 536 U.S. at 589, 122 S.Ct. 2428 ("Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). Most recently, in Cunningham v. California, ___ U.S. ___, ___ - ___, 127 S.Ct. 856, 863-64, 166 L.Ed.2d 856 (2007), the United States Supreme Court reiterated that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt." The jury's responsibility to find such facts includes the "aggravating circumstances that make a defendant eligible for the death penalty." Sattazahn v. Pennsylvania, 537 U.S. 101, 111, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) (plurality opinion).
In this case, although the sentencing occurred after Ring, the trial court found that the cold, calculating, and premeditated (CCP) aggravator was applicable despite the fact that it was neither advanced by the State nor instructed to the jury. I agree with the majority that the trial court did not depart from its position of impartiality in finding this aggravator. See majority op. at 751. I also agree with the majority that the trial court's finding of this aggravator, which was not supported by competent, substantial evidence, was harmless beyond a reasonable doubt because the trial court expressly stated it did not consider this aggravator in imposing the death sentence and substantial other aggravating circumstances existed. See majority op. at 764-65. However, I caution trial courts in the future not to consider or find aggravators on which the jury was not instructed.
QUINCE, J., concurs.
NOTES
[1] We have jurisdiction. See art. V,  3(b)(1), Fla. Const.
[2] However, Detective Daniel James, who was also at the scene, testified that he heard Dyke say the name "Ronnie."
[3] Clinita Lawrence is not related to Stefanie, Ruth, or Julius Lawrence.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Dr. Wright noted that Dyke had four wounds in her chest; however, he could not determine if the doctors in treating Dyke "had made stab wounds, or they had used the existing stab wounds to put the chest tubes in." The only chest wound he could conclusively say was not caused by hospital personnel was the stab wound through Dyke's sternum.
[6] Dr. Wright testified that it was, in effect, the healing process which killed Dyke:

[T]he organs were put in a position of almost dying, from a lack of blood pressure and oxygen. When that happens . . . the white blood cells, that were dormant . . . started circulating, and they are now activated white blood cells. And they fight infection, but in their activated state, are a danger to the rest of the body. They produce something called systemic . . . inflammatory . . . response syndrome. The toxins that are actually released by these blood cells attack the blood in the body as well. They produce something called ARDS, which is acute respiratory distress syndrome, they produce toxicity and destruction of the liver, which she had. They produce toxicity and destruction of the kidneys, which she had, and then produce toxicity and destruction of the brain, which she had.
[7] Dr. Wright noted that three of the wounds to Dyke's back made contact with her ribs, and that these stab wounds could have produced slippage as well.
[8] Spencer v. State, 615 So.2d 688 (Fla.1993).
[9] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[10] The trial court found the following nonstatutory mitigating circumstances: (1) while housed in the Broward County Jail, Williams was a model prisoner; (2) while housed in the Broward County Jail, Williams attended religious services; (3) Williams had a deprived childhood because he did not know his father, he lost his mother at an early age, he was raised in poverty by his sister, he did not start school until adolescence, and he had difficulty finding work after his two prior criminal convictions; (4) Williams is a loving person who never fought with his relatives, and was a good brother to his sister; and (5) Williams was slight in stature and was frequently beat up and robbed of his bus money on his way to school.
[11] Williams also asserts that the admission of these statements violated his Sixth Amendment right to confrontation under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in which the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 124 S.Ct. 1354. However, this Court has held that a specific objection is necessary to preserve a Crawford challenge. See Schoenwetter v. State, 931 So.2d 857, 871 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 587, 166 L.Ed.2d 437 (2006). In the instant case, while Williams objected to Dyke's out-of-court statements as inadmissible hearsay, he did not argue that admission of Dyke's statements would violate his right to confrontation. Since Williams failed to allege a confrontation violation in objecting to the admission of Dyke's statements, his Crawford challenge was not preserved. Cf. Rodgers v. State, 948 So.2d 655, 662-63 (Fla.2006) (Crawford challenge preserved where "[b]efore trial, Rodgers filed a motion to bar the State from using any hearsay during the penalty phase that would violate his rights under the Confrontation Clauses of both the state and federal constitutions"), petition for cert. filed, No. 06-10961 (U.S. Apr. 24, 2007).

Nonetheless, even if a Crawford challenge had been preserved, Williams would not be entitled to a new trial. In Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the High Court held that a victim's statements in response to a 911 operator's questions were not testimonial because they were made to enable police assistance in an ongoing emergency rather than in anticipation of trial. See id. at 2276-79. Similarly, Dyke's responses to the 911 operator's questions were not testimonial because Dyke was seeking emergency medical assistance for her life-threatening injuries. Further, even if the Gillespie statements and the hospital statements were testimonial to the extent that Dyke identified Williams as her attacker, there was abundant nontestimonial evidence offered at trial identifying Williams as the assailant. Specifically, during the 911 call, Dyke informed the operator that her attacker was a black man whose name was either "Rodney" or "Ronnie." She told the operator that she had the phone number of the attacker's girlfriend, and then proceeded to give the operator Stefanie Lawrence's phone number. The bite mark on Dyke's breast was matched to the dental cast of Williams. Williams's fingerprint was found in a stain of blood that had not been in the apartment when Ruth Lawrence left that morning to attend school. Williams's blood was found in Ruth's apartment after the attack, and both Ruth and Stefanie Lawrence testified that Williams had not previously bled in the apartment. Finally, when taken into custody, Williams had fresh wounds on his hands that were consistent with slippage, and one of the stab wounds to Dyke penetrated her sternum, the second most dense bone in the body. Given this overwhelming nontestimonial evidence that the jury could have relied upon in concluding that Williams was the individual who attacked Dyke, we conclude that any possible error by the trial court in admitting these statements was harmless. See Rodgers, 948 So.2d at 665 (holding that Crawford violation constituted harmless error where the erroneously admitted testimonial statement was merely cumulative to and corroborative of the defendant's own admissions).
[12] Indeed, in the previous section, we concluded the trial court did not abuse its discretion when it held that the 911 statements and the Gillespie statements were admissible as excited utterances even though the State did not assert that they were admissible under this hearsay exception.
[13] Further, because we have determined that the hospital statements were properly admitted as dying declarations, we do not address whether the statements were also admissible as excited utterances.
[14] In reaching this conclusion, we do not here address whether the trial court's finding of the CCP aggravator was supported by competent, substantial evidence. That issue will be addressed in the discussion of penalty phase challenges.
[15] Each of the aforementioned cases predates the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requiring that the facts essential to the imposition of the punishment be found by a jury beyond a reasonable doubt. See id. at 589, 122 S.Ct. 2428. Moreover, the jury had already recommended that Williams receive a sentence of death based upon the aggravators actually argued by the State, and in imposing a sentence of death, the trial court expressly stated that "[t]he imposition of the sentence in the present case is not contingent on the Court's finding the statutory aggravator of cold, calculating and premeditated." Accordingly, unless we were to strike all three of the other aggravators that were submitted to the jury and found by the trial court, the finding of the additional CCP aggravator would have no legal impact on the jury's advisory sentence or the trial court's ultimate recommendation.
[16] We would further note that the admission of evidence of Dyke's pregnancy was not such that it would have inflamed the jury or appealed to its emotions, and, therefore, the probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice."  90.403, Fla. Stat. (2006). According to the State, Dyke's pregnancy was only mentioned six times during the course of the entire trial, an assertion that Williams does not dispute. Three of the six references resulted from the 911 tape being played three times for the jury. The State mentioned Dyke's pregnancy during opening statements and during the penalty phase in asserting that Williams's crime was heinous, atrocious or cruel. Finally, Dyke's pregnancy was mentioned once by Officer Gillespie, who described Dyke's appearance when he arrived at the apartment in response to the 911 call. All evidence regarding the ultimate fate of Dyke's child was kept from the jury. Further, the jury did not view any photos of Dyke that revealed her advanced state of pregnancy or any scars that resulted from the cesarean section. The only photo of Dyke that the jury viewed was a postmortem photo, and it only depicts her face.
[17] Under the 1993 Florida Statutes, sexual battery is defined as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object."  794.011(1)(h), Fla. Stat. (1993).
[18] Despite Officer Gillespie's testimony that Dyke was "wet" when she answered the door, it is not established that Dyke, in fact, showered after the attack. Nonetheless, even if she did shower after the attack, a factual issue remains as to whether she voluntarily removed her clothing to shower or whether Williams forcibly removed her clothing.
[19] As noted in footnote 11, Williams failed to preserve a Crawford challenge to this out-of-court statement by Dyke. Although we do not decide, nonetheless, we question whether an unsolicited statement blurted out by a traumatized victim in extreme medical distress could be considered testimonial. See, e.g., People v. Diaz, 21 A.D.3d 58, 798 N.Y.S.2d 21, 28 (N.Y.App.Div.2005) ("As Carillo's statement from the ambulance was a visceral response to the presence of his attackers, and his statement was volunteered, rather than the result of structured police questioning, there was no Crawford violation in this case."); State v. Searcy, 288 Wis.2d 804, 709 N.W.2d 497, 512 (Wis.Ct.App.2005) (holding that "statements . . . offered unsolicited by a victim or witness at the scene of a traumatic event, and . . . not generated by the desire of the prosecution or police to seek evidence against a particular suspect" were not testimonial).
[20] Evidence revealed that there were two stairways to the second floor of the apartment complex where Ruth lived, located at opposite ends of the building. Ruth's apartment was on the second floor immediately adjacent to one of the stairways. Hence, by ascending that particular stairway, the subject apartment could be accessed without passing the windows of the apartments of any other tenants.