707 So.2d 664 (1998)
Kristopher SANDERS, Appellant,
v.
STATE of Florida, Appellee.
No. 87231.
Supreme Court of Florida.
January 22, 1998.
Rehearing Denied April 2, 1998.
*665 James Marion Moorman, Public Defender and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Robert J. Landry, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal Kristopher Sanders' conviction of first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the conviction but find that we must remand this cause for a new penalty phase proceeding because the trial court (1) excused a juror for cause without allowing defense counsel to question the juror, and (2) allowed a mental health expert to testify on behalf of the State even though that expert initially was retained as a confidential expert for Sanders.
The facts of this case are as follows. On April 26, 1994, the body of Henry "Hank" Clark (the victim) was discovered slumped over in the driver's seat of a truck parked off a highway. The victim had been shot three times: once in the right side of the head, once near the top of the head, and once in the upper arm. The wounds were consistent with the victim having been shot by someone sitting in the passenger's seat. Testing revealed that, although cocaine metabolites were found in the victim's blood, it was unlikely that he had been using cocaine just prior to his death.
Among other things, officers found the following items in the vehicle: a total of $2,379 in cash, $1,330 of which was in plain view on the visor; a total of 215 grams of marijuana, some of which was contained in two bags, located on the seat next to the victim; a postman's scale; a cattle prod or "stun gun" under the driver's seat; and a .9 millimeter shell casing on the floor. Two palm prints lifted from the truck matched Sanders'. Footprints found outside the vehicle appeared to originate from the passenger's side and led out to the highway.
Several days before the murder, a witness overheard a conversation that occurred in Joey Duckett's living room. In that conversation, Duckett stated that Hank "needed to die," to which Sanders replied that he would "do it."
After Sanders was picked up and given the appropriate Miranda[1] warnings, he provided a statement to law enforcement officers, in which he admitted killing the victim. He claimed that he and the victim drove to Tampa and purchased crack cocaine, that they stopped at a store and Sanders called Duckett to tell him where he was, that they stopped and smoked some cocaine, that the victim decided to smoke the cocaine rather than sell it, that an argument ensued, that Sanders had a gun hidden inside his pants, and that Sanders "flipped out" and shot the victim when the victim reached for the cattle prod under the seat. At the time he gave the statement, Sanders appeared to be calm and did not appear to be under the influence of drugs. He also stated that he had no remorse for the killing. ("It just means it's one less face in the world I have to deal with.") He acknowledged that Duckett paid him $900 to kill the victim four days before the murder but stated that the planned murder was not to occur for another two weeks.
Sanders also stated that, when he got out of the truck after killing the victim, George Nashef drove by and stopped and picked him up. Sanders' versions of how Nashef knew *666 to pick him up were inconsistent. Sanders further stated that Nashef took him to Duckett's house after the murder where he showered and disposed of his bloody clothing.
Nashef testified and admitted that his version of the events had changed over time. In the beginning, he denied any involvement. Later, he gave several statements, the details of which were somewhat inconsistent. At trial, he testified that Sanders arranged for him to pick Sanders up at the site where the murder occurred and that he took Sanders back to Duckett's house. He indicated that he originally denied involvement because he was afraid of being killed and of being incriminated.
Sanders was convicted as charged.
At the penalty phase proceeding, the State presented testimony to reflect that after the murder Sanders showed the victim's gold necklace to an individual and told the individual that the dent in the necklace had been caused by the gunshot to the victim's neck.
Sanders presented testimony regarding his age of twenty years, his gentle and helpful nature and kind disposition, his ability to fix things, his traumatic childhood, his drug addiction, and the fact that he had obtained his GED since being arrested in this case. His mental health expert, Dr. Michael Maher, a psychiatrist, testified that Sanders had a low IQ (80); had a history of mental problems including depression, personality disorder, and self-mutilation; had been admitted to the Arthur Dozier School for Boys; had been involuntarily committed under the Baker Act; and had stayed almost six months at a residential treatment facility as a result of cocaine use and gasoline inhalation. He concluded that Sanders was under extreme mental or emotional disturbance and that his ability to appreciate the criminality of his conduct was substantially impaired at the time of the murder.
In rebuttal, the State called Dr. Sidney Merin, a clinical psychologist. Sanders objected to Dr. Merin's testimony because Dr. Merin had originally been retained as a confidential expert for Sanders and had been provided with confidential and privileged information regarding Sanders. Although the information was in Dr. Merin's possession for six months, he stated that he did not review this information before it was returned to Sanders. Dr. Merin was allowed to testify. He did not interview Sanders before giving his testimony but concluded, based on Sanders' taped confession and other records, that no mental mitigators were present and that much of Sanders' behavior was done to get attention.
The jury recommended, by an eight-to-four vote,[2] that Sanders be sentenced to death. The trial judge followed that recommendation, finding one aggravating circumstance: that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). He found no statutory mitigating circumstances but did find a number of nonstatutory mitigating circumstances.[3]
In this appeal, Sanders raises a total of eight issues,[4] only one of which involves the conviction phase. In the conviction phase issue, which involves the penalty phase as well, Sanders asserts that the trial *667 court erred in refusing to allow the defense to cross-examine witness George Nashef about his drug-running activities. Sanders argues that the judge's ruling kept evidence critical to Nashef's credibility from the jury. Because Nashef was a key witness, Sanders contends that the inclusion of this testimony would have prevented the State from establishing that the murder was premeditated for conviction purposes and that it was cold, calculated, and premeditated for sentencing purposes.
Section 90.612(2), Florida Statutes (1995), provides:
Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in its discretion, permit inquiry into additional matters.
Under this provision, a trial judge has broad discretion in determining limitations to be placed on cross-examination. Geralds v. State, 674 So.2d 96 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Jones v. State, 580 So.2d 143 (Fla. 1991). A judge's determination to allow or disallow questioning in that regard is not subject to review unless the determination is clearly erroneous. Smith v. State, 404 So.2d 167 (Fla. 1st DCA 1981). However, limiting cross-examination in a manner that precludes relevant and important facts bearing on the trustworthiness of testimony constitutes error, especially when the cross-examination is directed at a witness for the prosecution. Stradtman v. State, 334 So.2d 100, 101 (Fla. 3d DCA 1976), approved, 346 So.2d 67 (Fla. 1977).
In this case, the State elicited testimony from Nashef regarding his fear for his safety as an explanation for the differing versions of the events surrounding the murder that he gave to law enforcement officers during the course of the investigation in this case. To counter this testimony, defense counsel asked Nashef on cross-examination if he was running drugs for the group of people with whom Sanders associated. The State objected. The trial judge allowed a proffer of Nashef's testimony before he ruled. In the proffer, Nashef testified that he got drugs for the group one time and that he ran drugs three or four other times for another group. The judge sustained the State's objection and instructed the jury to disregard defense counsel's question about Nashef's drug-running activities.
Under these circumstances, we do not conclude that the judge abused his discretion in disallowing defense counsel's question as to Nashef's drug-running activities. See Jones (judge properly disallowed questions regarding whether witness was a drug dealer). Moreover, even were we to conclude that the testimony was erroneously excluded, we would find that the error had no effect on the outcome of the conviction.[5] The jury was well aware of Nashef's inconsistent statements to law enforcement officers regarding this crime, and in his proffered testimony he admitted running drugs for Duckett on only one occasion. The proffered testimony would have added little, if any, substance to Sanders' attempt to discredit Nashef.
We now turn to the penalty phase issues raised by Sanders. In his first penalty phase issue, Sanders contends that the trial judge violated Florida Rule of Criminal Procedure 3.300 and Sanders' due process rights when he excused a prospective juror for cause without first allowing defense counsel to question the juror. At the beginning of voir dire, the trial judge told the prospective jurors that he would question them, after which counsel for each side would do the same. The judge collectively instructed the jurors on the procedure applicable to their decision on recommending death or life imprisonment. He then asked whether any of the jurors were opposed to the death penalty. One juror raised her hand (Juror P). Upon further questioning by the judge, Juror P indicated that she would vote against the death penalty in all cases. The judge then invited the State to question the jurors. Instead, the State challenged Juror P for cause. At this point, defense counsel asked that he be allowed to attempt to rehabilitate Juror P. The State objected, stating that rehabilitation was not possible in light of *668 Juror P's unequivocal answer. Defense counsel again asked to question the juror. Instead of allowing defense counsel to question the juror, the trial judge asked additional questions of Juror P, the answers to which indicated she would not vote for the death penalty. The judge then excused her for cause. Defense counsel again renewed his objection to not being allowed to personally question the juror.
Rule 3.300(b) provides that counsel for both the state and defendant shall have the right to examine jurors orally on their voir dire.[6] This Court has repeatedly determined that refusal to allow defense counsel to attempt to rehabilitate death scrupled jurors on voir dire violates both due process and rule 3.300(b). See, e.g., Willacy v. State, 640 So.2d 1079 (Fla.1994); Hernandez v. State, 621 So.2d 1353 (Fla.1993); O'Connell v. State, 480 So.2d 1284 (Fla.1985). The State, however, argues that those cases are distinguishable because, in those cases, it was the State rather than the trial judge who questioned the jurors before they were excused for cause, or the jurors' responses were equivocal. We disagree.
Even though trial judges may question prospective jurors, their role in jury selection must not impair counsel's right and duty to question the venire. Miller v. State, 683 So.2d 600 (Fla. 2d DCA 1996). Our holdings in Willacy, Hernandez, and O'Connell[7] set forth the general principle that defense counsel must be afforded an opportunity to rehabilitate jurors who have expressed objections to the death penalty or conscientious or religious scruples against its infliction. This is because the decision of whether a person deserves to live or die must not be entrusted to a tribunal organized to return a "verdict of death." Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). Accordingly, it was error for the trial judge to refuse to allow defense counsel to question Juror P.
We also agree with Sanders' second penalty phase contention that the trial judge erred in allowing Dr. Sidney Merin to testify on behalf of the State. In May 1994, the trial court granted Sanders' motion to appoint a confidential expert pursuant to Florida Rule of Criminal Procedure 3.216(a). The order did not identify a particular expert by name. In June 1994, defense counsel wrote a letter to Dr. Merin, asking that he serve as the defense expert. Subsequently, defense counsel provided Dr. Merin with numerous documents regarding Sanders and communicated information to Dr. Merin about Sanders' case. Due to an "office snafu," Dr. Merin took no action on the case and did not interview Sanders. After several attempts, defense counsel finally gave up trying to get Dr. Merin to interview Sanders and hired another expert.
In February 1995, the State listed Dr. Merin as a witness. About that same time, Dr. Merin wrote to defense counsel, returning the documents forwarded to him by defense counsel with the assurance that he had not reviewed any of them. At that point, Dr. Merin had been in possession of the documents forwarded by defense counsel for over six months. Based on the fact that Dr. Merin had originally been retained to represent Sanders, defense counsel moved to strike Dr. Merin as a witness. The trial court denied the motion, relying on Rose v. State, 591 So.2d 195 (Fla. 4th DCA 1991).
Rule 3.216(a) provides as follows:
(a) Expert to Aid Defense Counsel. When in any criminal case counsel for a defendant adjudged to be indigent or partially indigent, whether public defender or court *669 appointed, shall have reason to believe that the defendant may be incompetent to proceed or that the defendant may have been insane at the time of the offense or probation or community control violation, counsel may so inform the court who shall appoint 1 expert to examine the defendant in order to assist counsel in the preparation of the defense. The expert shall report only to the attorney for the defendant and matters related to the expert shall be deemed to fall under the lawyer-client privilege.

(Emphasis added.) This rule codified the holding in Pouncy v. State, 353 So.2d 640 (Fla. 3d DCA 1977), in which the court concluded that, where an expert is hired solely to assist the defense and will not be called as a witness, the State may not depose the expert or call him as a witness. Lovette v. State, 636 So.2d 1304, 1308 (Fla.1994). Under this rule, the State cannot make a confidential expert for the defense its witness when the attorney-client privilege has not been waived. Lovette; Ursry v. State, 428 So.2d 713 (Fla. 4th DCA 1983); Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982). Unless otherwise waived, only when the defense calls the expert as a witness is the privilege relinquished. Lovette; Ursry.
Rose, the case relied on by the trial court, did not involve rule 3.216(a) or the attorney-client privilege; it involved an issue regarding the attorney's work product. In fact, the court in that case specifically distinguished the issue there from a rule 3.216(a) attorney-client privilege issue. Moreover, even the court in Rose expressed concern about the State's use of a witness consulted by the defense.
In this case, Dr. Merin was retained by Sanders and provided with privileged materials of Sanders' that were in his possession for over six months. Further, Dr. Merin himself was disturbed about testifying for the State after having been first retained on behalf of Sanders. He explained: "I felt horribly guilty and uncomfortable when I was reminded that [defense counsel] had sent this to me and emotions act as a very, very powerful reminder." He further stated: "I felt very uncomfortable about being called by both sides." Only after being reassured by the State that it was acceptable to the trial court did Dr. Merin accept the commission to assist the State. Because Dr. Merin was not called as a witness by Sanders and because Sanders did not otherwise waive the attorney-client privilege under the rule, it was error to allow Dr. Merin to testify on behalf of the State.
Based on the errors that occurred in this case, we conclude that a new penalty phase proceeding is required. This conclusion renders Sanders' remaining penalty phase issues moot.
Accordingly, we affirm Kristopher Sanders' conviction of first-degree murder but we vacate his sentence of death and remand this cause for a new penalty phase proceeding.
It is so ordered.
OVERTON, SHAW and HARDING, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs as to conviction and concurs in result only as to sentence.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., concurs.
ANSTEAD, Justice, concurring in part and dissenting in part.
While I concur with most of the majority opinion, I do not agree that it was not error to limit the cross-examination of the important state witness, George Nashef.
The critical issue in this case was not so much whether the defendant shot the victim. Rather, at issue was whether the defendant did so pursuant to the direction of Joey Duckett, a drug dealer, or whether the killing took place spontaneously during an altercation between the defendant and the victim. Because all of the people involved, including the victim, the defendant, the witness Nashef, and the alleged instigator, Duckett, were heavily involved in illegal drug activities, it was important to determine Nashef's involvement in the illegal activities as well as the plot to kill the victim. Fortunately, a new penalty phase will provide an opportunity for the trial court to fully explore the true facts *670 of this killing, and to accurately determine the actual culpability of all of those involved, including Duckett and Nashef.
KOGAN, C.J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The trial judge's sentencing order erroneously states that the recommendation was by a nine-to-three vote.
[3] The nonstatutory mitigating factors were: assistance to others (little weight); obtained GED while awaiting trial (little weight); cooperation with authorities (moderate weight); history of drug abuse and use of drugs at time of offense (moderate weight); mental health problems (minimal weight); alleged principal was uncharged (slight weight); and good behavior during trial (slight weight).
[4] He claims that (1) the trial judge violated Florida Rule of Criminal Procedure 3.300 and his due process rights in excusing a prospective juror for cause; (2) the trial judge erred in refusing to allow the defense to cross-examine witness Nashef about his drug running activities; (3) the trial judge erred in failing to consider the disparate treatment accorded to Duckett; (4) the trial judge erred in allowing Dr. Merin to testify on behalf of the State; (5) the trial judge erred in rejecting Sanders' age as a mitigating circumstance; (6) Sanders' death sentence is disproportionate; (7) the trial judge erred in not instructing the jury on the sentencing option of life imprisonment without parole; and (8) the jury instruction on CCP was improper.
[5] Our remand for a new penalty phase proceeding moots this issue as it pertains to CCP.
[6] Rule 3.300(b) provides:

The court may ... examine each prospective juror individually or may examine the prospective jurors collectively. Counsel for both the state and defendant shall have the right to examine jurors orally on their voir dire. The order in which the parties may examine each juror shall be determined by the court. The right of the parties to conduct an examination of each juror orally shall be preserved.
[7] Notably, in O'Connell, the error was sufficient to have permeated the convictions themselves. However, the error in that case involved not only the refusal to allow defense counsel to examine excluded jurors on voir dire but also the refusal to excuse three jurors for cause who would automatically recommend death. Here, as in Willacy and Hernandez, the error goes only to the sentencing phase.