# Supreme Court of Florida

_____

No. SC13-1472
_____

**RONNIE KEITH WILLIAMS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 29, 2017]

PER CURIAM.

Ronnie Keith Williams appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the postconviction court's order denying all claims, with the exception of the ineffective assistance of penalty phase counsel claim, which we do not address because Williams is entitled to a new penalty phase in light of Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017), and Mosley v. State (Mosley), 209 So. 3d 1248 (Fla. 2016).

# FACTS AND PROCEDURAL BACKGROUND

Williams was initially convicted and sentenced to death for the first-degree murder of Lisa Dyke. See Williams v. State (Williams I), 792 So. 2d 1207, 1207 (Fla. 2001).[1] However, we reversed the conviction on direct appeal due to the trial court's error in substituting an alternate juror on the panel after the jury began its guilt-phase deliberations. Id. Williams was retried and again convicted of the first-degree murder of Dyke. See Williams v. State (Williams II), 967 So. 2d 735, 741 (Fla. 2007). The jury recommended the death penalty by a vote of ten to two. Id. at 746. The trial court followed the recommendation and sentenced Williams to death. Id. In our opinion affirming the conviction and sentence after the retrial, we described the facts of the murder:

> On Tuesday, January 26, 1993, at approximately 8:30 a.m., a call was made to 911 from a woman who identified herself as Lisa Dyke. Dyke stated that she had been stabbed in her heart and back, and she was more than seven months pregnant. When the operator inquired of Dyke as to who stabbed her, she responded with a name that sounded to the operator like "Rodney." Dyke then informed the operator that her attacker was a black male and, although she did not know his last name, she could provide a phone number from which that information could be obtained. Dyke provided the phone number and stated that it belonged to the girlfriend of the man who had stabbed her.
>
> When Dyke opened her door for the police, Officer Brian Gillespie observed an eighteen-year-old black female who was nude,

_____

1. In that decision, Williams was referred to as Ronald Keith Williams. However, in subsequent cases, Williams has been, and will continue to be, referred to as Ronnie Keith Williams.

bloody, and wet, "as if she tried to take a shower." Dyke was holding clothing in front of herself in an attempt to cover her nudity. According to Gillespie, Dyke was upset and beginning to lose consciousness. Gillespie observed stab wounds on Dyke's upper torso and back and noticed that there was blood "pretty much everywhere." As she lay on the couch, Dyke stated repeatedly to Gillespie that she did not want to die. While the paramedics were treating Dyke, Gillespie asked who had stabbed her. Through the oxygen mask that covered Dyke's face, and over the sounds of numerous police and paramedic radios, Gillespie heard Dyke say the name "Rodney." When Gillespie asked Dyke who Rodney was, Dyke replied, "Ruth's sister's boyfriend." Dyke gave Gillespie the telephone number of "Ruth's sister." Dyke then made the unsolicited statement to Gillespie, "He raped me." Soon after, the paramedics transported Dyke to the hospital. Hospital personnel were unable to perform a rape examination or collect evidentiary samples for analysis before Dyke was rushed into surgery.

While processing the crime scene, Detective Bob Cerat noticed that there were no signs of forced entry into the apartment. In the bedroom, Cerat discovered a knife that was stained with the same reddish substance that appeared throughout the apartment. . . .

Detective Anthony Lewis determined that Ruth Lawrence rented the apartment where the stabbing had occurred. He met with Ruth, and she stated that Lisa Dyke had been babysitting Ruth's nine-month-old son in the apartment. Dyke had been living with Ruth for approximately two weeks. Dyke was connected with Ruth because Dyke was dating Ruth's brother, Julius, and Julius was the father of Dyke's unborn baby. The detective discovered that Ruth's sister was named Stefanie Lawrence, and the name of Stefanie's boyfriend was Ronnie Williams. At the time of the attack, Stefanie and Ronnie had been dating for approximately six months. Stefanie lived with her father and Julius, and her telephone number was the number that Dyke provided to police and the 911 operator to identify her attacker. Ruth testified at trial that when she left the apartment that morning to go to school, there was no blood in the apartment where Dyke was found, and Williams had never before bled in her apartment.

Subsequent investigation revealed that on the night before the crime, Ruth had participated in a three-way telephone call with Stefanie and Williams . . . . Dyke was listening to the conversation on another extension in Ruth's apartment. During that call, Ruth

prompted Stefanie to break her relationship with Williams, and Stefanie proceeded to do so during the phone conversation. Stefanie then advised Williams that he was not to return to Ruth's apartment again. According to Stefanie, Williams was upset, and he repeatedly stated that they could resolve the problem. After the call ended, Stefanie did not speak to Williams again, but he paged her four or five times that night. Stefanie did not respond to the pages, and the last page from Williams was around midnight.

Stefanie Lawrence agreed to assist the police in locating where Williams lived. Officer David Jones went to the house identified by Stefanie and encountered Williams's sister, Clinita Lawrence, who informed Officer Jones that she had transported Williams to a mental health crisis facility earlier that day when she noticed that he was acting bizarrely. Officer Jones proceeded to the crisis center and located Williams. Officer Jones observed that Williams had several fresh bandages on both of his hands. Williams was transported to the police station, and Officer Jones advised him of his Miranda rights.

When Dyke regained consciousness after her surgery, she wrote a note to a nurse indicating a desire to speak to the authorities. Detective Daniel James spoke to Dyke in the intensive care unit. Dyke agreed to respond to Detective James's questions by nodding her head for "yes" and moving her head from side-to-side for "no" because she was unable to speak with the tubes which had been placed in her mouth. Detective James produced a photographic lineup of six individuals and asked Dyke if she recognized the person who attacked her. Dyke tapped on the photo of Ronnie Williams with her finger.

At the police station, Williams admitted to Officer Jones that he knew Dyke, but stated that he had not been in Ruth's apartment at the time Dyke was stabbed. With regard to the bandages on his hands, Williams stated that he had cut his fingers on a knife as he was washing dishes. He mentioned that he was having problems with his girlfriend, and that Dyke had been "kind of the go-between person." When Williams was informed that Dyke had identified him as the person who stabbed her, Williams requested an attorney, and the interview was terminated. At that time, Williams was arrested for the attack on Dyke.

On January 28, 1993, when Detective James returned to check on Dyke's condition and to photograph her wounds, he realized that some of the wounds appeared to be bite marks. James photographed bite marks on Dyke's chest, arm, breast, and the back of her shoulder.

Dyke also indicated a bite mark in her groin area, but James was unable to photograph that area because Dyke was again taken into surgery to deliver her baby by cesarean section. Dyke died on February 14, 1993, nineteen days after the stabbing.

At trial, forensic pathologist Ronald Wright noted that Dyke had sustained six stab wounds in her back, some of which penetrated her lungs, which caused bleeding into the chest cavity and collapse of the lungs. Further, one stab wound had penetrated Dyke's sternum and was at least four inches deep. Wright opined that the original stab wound would have been deeper, but it was impossible to determine the exact depth because Dyke's wounds had been healing for nineteen days before her death. The doctor noted that Dyke had defensive wounds on her hands and bite marks on her body. Dr. Wright ultimately concluded that the cause of Dyke's death was multiple stab wounds which, over a period of nineteen days, produced a fatally high level of toxicity in Dyke's body. Dr. Wright further reviewed the photos of the cuts on Williams's hands, and concluded that the cuts were consistent with slippage—a phenomenon that occurs when a person hits a hard surface (such as a sternum) with a hiltless knife (such as that which was recovered from the apartment), and the hand slides down the knife, producing a cut on the hand of the person holding it.

Fingerprint analyst Fred Boyd testified that a fingerprint found in a reddish substance that was located on the bathroom door of Ruth's apartment matched the known print of Williams's left ring finger. DNA testing on blood samples taken from two pieces of clothing collected from the apartment generated DNA profiles that matched the profile of Williams at four genetic locations. According to a DNA analysis expert, the frequency of occurrence of finding the same profile in two unrelated individuals who matched at four of these points would be one in 120 million African-Americans. Finally, forensic dentist Richard Souviron compared the photographs of the bite mark on Dyke's breast with dental casts made from the mouth of Williams and concluded with reasonable certainty that the bite on Dyke's breast was made by Williams.

Id. at 741-44 (footnotes omitted). The jury found Williams guilty of first-degree murder and indicated in an interrogatory verdict that its finding was based on both premeditated and felony murder theories. Id. at 744.

In sentencing Williams to death, the trial court found that four aggravating circumstances were proven beyond a reasonable doubt: (1) Williams was previously convicted of a felony involving the use or threat of violence (the second-degree murder of Gaynel Jeffrey in 1984 and an indecent assault upon a nine-year-old girl in 1982) (great weight); (2) the murder was committed while Williams was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit a sexual battery (great weight); (3) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (moderate weight). Id. at 744-46. The trial court found that two statutory mitigating circumstances were present: (1) Williams was under extreme mental or emotional disturbance at the time of the crime (little weight); and (2) the capacity of Williams to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (little weight). Id. The trial court also found five nonstatutory mitigating circumstances and accorded each slight weight:

> (1) while housed in the Broward County Jail, Williams was a model prisoner; (2) while housed in the Broward County Jail, Williams

> attended religious services; (3) Williams had a deprived childhood because he did not know his father, he lost his mother at an early age, he was raised in poverty by his sister, he did not start school until adolescence, and he had difficulty finding work after his two prior criminal convictions; (4) Williams is a loving person who never fought with his relatives, and was a good brother to his sister; and (5) Williams was slight in stature and was frequently beat up and robbed of his bus money on his way to school.

Id. at 746 & n.10.

Williams raised twenty issues on direct appeal. He argued that the trial court: (1) abused its discretion when it admitted out-of-court statements made by Dyke; (2) improperly departed from a position of neutrality; (3) abused its discretion when it allowed the jury to have access to a transcript of the 911 call that was prepared by the State; (4) abused its discretion when it admitted evidence of Dyke's pregnancy; (5) erred when it submitted a felony murder case with sexual battery or attempted sexual battery as the underlying felony to the jury and when it instructed the jury on the aggravating circumstance that the murder occurred during a sexual battery or an attempted sexual battery; (6) committed fundamental error by submitting a felony murder charge to the jury that was contrary to the statute governing felony murder, which requires that the death occur during the commission of the underlying felony; (7) erred when it submitted a premeditated murder case to the jury; (8) erred when it permitted the State to proceed on a theory of felony murder where the indictment gave no indication of the theory; (9) constructively and improperly amended the indictment when it instructed the

jury on felony murder; (10) committed fundamental error when it failed to instruct the jury that the presumption of innocence applied to the charge of felony murder; (11) erred when it failed to instruct that a conviction on the theory of the murder must be unanimous; (12) erroneously failed to instruct the jury that it must determine beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances found before it could recommend death; (13)(a) erroneously instructed the jury that it was required to determine whether sufficient mitigating circumstances existed that outweighed the aggravating circumstances, and (b) the instruction that the jury is to consider mitigation only if it is "reasonably convinced" of its existence is unconstitutional; (14) failed to make the proper findings for imposition of the death penalty; (15) erred when it used Williams's conviction for indecent assault to support the prior violent felony aggravating circumstance; (16) erred when it found HAC as an aggravating circumstance; and (17) erred when it found CCP as an aggravating circumstance. Williams also asserted that (18) the death sentence is disproportionate; (19) imposition of the death penalty in Williams's case violates Ring v. Arizona, 536 U.S. 584 (2002); and (20) Florida's capital sentencing structure fails to narrow the category of death-eligible individuals as mandated by Furman v. Georgia, 408 U.S. 238 (1972). Williams II, 967 So. 2d at 747-67.

We agreed with Williams that competent, substantial evidence did not exist to support the finding of CCP and struck this aggravating circumstance. Id. at 765. However, we concluded there was no reasonable probability that the finding of CCP affected the sentence imposed and determined that the error was harmless. Id. All other challenges were rejected, and we affirmed the conviction and sentence of death. Id. at 748-67. In 2008, the United States Supreme Court denied certiorari review. Williams v. Florida, 552 U.S. 1283 (2008).

In 2009, Williams filed a motion for postconviction relief, raising fourteen claims. Several of the claims were subsequently amended and a fifteenth claim was added. The claims were: (1) section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 are unconstitutional facially and as applied; (2) the one-year time limit for seeking postconviction relief in a capital case is unconstitutional; (3) Williams received ineffective assistance of counsel during his first trial and, although he was granted a new trial in Williams I, he was prejudiced because the pretrial rulings became the law of the case, and more than ten years passed between the indictment and the retrial; (4) rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar unconstitutionally precluded Williams from fully investigating possible juror misconduct, and retrial counsel was ineffective for failing to move for a change of venue; (5) retrial counsel was ineffective during the guilt phase; (6) newly discovered evidence renders the forensic science used to

convict Williams unreliable and invalid; (7) Williams is ineligible to be executed because he is intellectually disabled, and retrial counsel was ineffective for failing to raise intellectual disability as a bar to execution; (8) Williams was denied access to a competent mental health expert as required by Ake v. Oklahoma, 470 U.S. 68 (1985); (9) retrial counsel was ineffective during the penalty phase; (10) improper comments and misstatements of the law by the prosecutor deprived Williams of a fair trial; (11) Williams is innocent of first-degree murder because his mental state prevented him from forming the intent to commit premeditated murder; he is innocent of felony murder because there was insufficient evidence to support the underlying sexual battery; the instructions provided to the jury on the aggravating circumstances were inapplicable and unconstitutionally vague; and the mitigation evidence available renders the death sentence disproportionate; (12) an American Bar Association report demonstrates that Florida's death penalty system is unconstitutional; (13) cumulative error; (14) Florida's lethal injection protocol is unconstitutional on its face and as applied; and (15) the State committed violations of Brady v. Maryland, 373 U.S. 83 (1963).  After a case management conference, the postconviction court granted Williams an evidentiary hearing on portions of claims 7, 8, and 9.  The remainder of the claims were held in abeyance pending completion of the evidentiary hearing.

During the evidentiary hearing, Williams presented multiple witnesses, including Dr. Mark Tassé, a university professor who also conducts intellectual disability evaluations; Dr. George Woods, Jr., a psychiatrist; and Dr. Thomas Oakland, a psychologist. The only witness presented by the State was Dr. Gregory Prichard, a clinical psychologist. In May 2013, the postconviction court entered a comprehensive order denying all claims. This appeal follows.

## ANALYSIS

### Public Records

Williams alleges that section 27.7081, Florida Statutes (2008),[2] and Florida Rule of Criminal Procedure 3.852 are unconstitutional both facially and as applied because they prevent access to public records to which he is otherwise entitled under article I, section 24, of the Florida Constitution. We disagree.

We have previously rejected similar facial constitutional challenges that assert section 27.7081 and rule 3.852 impermissibly restrict a capital defendant's right to access public records. See, e.g., Lambrix v. State, 124 So. 3d 890, 895 n.2 (Fla. 2013); Wyatt v. State, 71 So. 3d 86, 110-11 (Fla. 2011). Therefore, Williams's facial challenge is without merit.

---

2. Although Williams referred to section 119.19 in his postconviction motion, effective October 1, 2005, section 119.19 was renumbered as section 27.7081. See ch. 2005-251, § 39, Laws of Fla.

- 11 -

Williams's as-applied challenge also fails. During the postconviction proceedings, Williams filed voluminous public records requests with multiple state and local agencies. On appeal, he focuses on the delay by the Florida Department of Corrections (DOC) in providing some records and the destruction of other records under a DOC retention policy.

In denying this portion of Williams's public records challenge, the postconviction court concluded that (1) Williams received all existing DOC records to which he was entitled; (2) the DOC did not intentionally withhold the records from Williams's prior indecent assault and second-degree murder convictions; and (3) the retention policy, which led to the destruction of those records, was reasonable. The postconviction court also noted that collateral counsel's request for additional time to review the provided records and prepare supplemental demands for additional records was granted, and Williams was twice granted leave to amend his postconviction motion. Given that the postconviction court allowed Williams to amend his motion on more than one occasion and to seek production of additional records, we fail to see how Williams was harmed or how his constitutional rights were violated due to any delays by the DOC.

With regard to the requests for records of Williams's prior incarceration for the 1984 murder of Gaynel Jeffrey and his probationary period for the 1982 indecent assault, the record reflects counsel for the DOC reported that a diligent

search had been conducted, and it was more likely than not the records were destroyed in accordance with the DOC's long-established retention schedules. The postconviction court concluded that the DOC did not willfully destroy the records of Williams's prior incarceration and probationary periods. The court noted the records related to short periods of time while Williams was on probation and while he was incarcerated at Hendry Correctional Institution, and some of the records were over twenty-five years old. The court found that the DOC retention policy "was reasonable at the time and reasonable now."

Williams nonetheless contends that the postconviction court's ruling constitutes an abuse of discretion. According to Williams, the DOC should have produced the records from the second-degree murder conviction during Williams's initial trial for Dyke's murder, when those records were still in existence, and the failure to do so constitutes a Brady violation. We disagree. To establish a Brady violation, a defendant must show "(1) that favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced." Doorbal v. State, 983 So. 2d 464, 480 (Fla. 2008). Williams has not identified what information these records contained or how the information was material or exculpatory. He therefore cannot demonstrate that he was prejudiced by the failure to obtain the records. Williams asserts that "[t]he records from the prior periods of

incarceration <u>may</u> provide information in mitigation of the death sentence." (emphasis added). However, this purely speculative assertion fails to establish a <u>Brady</u> violation. Further, Williams has failed to demonstrate how the records retention policy of the DOC is unreasonable or violated his right of access to public records. We therefore affirm the denial of Williams's as-applied constitutional challenge to section 27.7081 and rule 3.852.

**Ineffective Assistance of Initial Trial Counsel**

Williams contends that the postconviction court erred when it summarily denied his claim that the failure of the trial court to provide him with competent counsel during his first trial for Dyke's murder constituted an incurable violation of due process. He asserts that the trial court and the prosecutor knew or should have known that Williams's initial court-appointed counsel was incompetent because of his erratic behavior and lack of preparedness. According to Williams, he was prejudiced during his 2004 retrial due to the passage of time because records were destroyed, witnesses died, and memories faded. This claim is without merit.

Where trial counsel is found to be ineffective under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the traditional remedy is that the defendant obtains a new guilt or penalty phase. <u>See, e.g.</u>, <u>State v. Fitzpatrick</u>, 118 So. 3d 737, 741, 770 (Fla. 2013) (affirming postconviction order granting a new trial where

- 14 -

counsel was ineffective during the guilt phase); <u>Rose v. State</u>, 675 So. 2d 567, 574 (Fla. 1996) (vacating death sentence and remanding for a new penalty phase where counsel was ineffective during the penalty phase). Williams's initial conviction was reversed on grounds that the trial court erred when it substituted an alternate juror onto the jury panel to replace an original juror who was unable to proceed after guilt-phase deliberations commenced. <u>Williams I</u>, 792 So. 2d at 1207. Having been granted a new trial, Williams already received the relief to which he would have been entitled had initial trial counsel been found ineffective. Just over eleven years elapsed between Dyke's murder in 1993 and the commencement of the retrial in 2004. However, part of this delay was the result of Williams's successful appeal of his initial conviction. The cases relied upon by Williams do not support the contention that if counsel is deficient, the State is forever barred from seeking the death penalty.

In <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972), the United States Supreme Court identified four factors that are relevant in making a determination as to whether a defendant's due process right to a speedy trial is violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's invocation of the right to speedy trial; and (4) prejudice to the defendant. Here, the postconviction court applied these four factors and noted that initial trial counsel sought numerous continuances prior to the first trial. With regard to Williams's claim that beneficial

- 15 -

records were lost or destroyed due to initial trial counsel's ineffectiveness and the delay caused by it, the postconviction court found that the prejudice asserted was speculative because Williams failed to identify with specificity the records or information contained therein which could not be located prior to the 2004 retrial. Williams's allegations of prejudice are too speculative to justify a conclusion that his due process rights were violated. To the extent Williams asserts the trial court should have intervened and removed his initial trial counsel, any error in failing to do so was cured by Williams's receipt of a new trial. Although one of Williams's witnesses from the initial trial died before the retrial, her prior testimony was read into the record, and Williams suffered no prejudice. We therefore affirm the summary denial of this claim.

## Conflict of Interest

Williams asserts that a conflict of interest occurred, described as follows:

Dr. Brannon testified at the behest of Willams's 1996 defense attorney . . . to establish that [counsel] was sufficiently stable to try Williams's capital case. This alone presented conflict between the client and his lawyer. At that point, their interests were adverse, although no one informed Williams of that fact. The prosecutor was present at the 1996 hearing regarding [counsel's] mental illness and stay at a mental hospital, yet the State presented no objection to Williams being tried by [counsel]. Eight years later, the same prosecutor hired Dr. Brannon as a confidential and consulting mental health expert to assist the State in the penalty phase. The fact that Dr. Brannon readily accepted the role demonstrates the prior conflict that served to prejudice Williams.

In support of this claim, Williams relies on <u>Walton v. State</u>, 847 So. 2d 438 (Fla. 2003), and <u>Sanders v. State</u>, 707 So. 2d 664 (Fla. 1998), but in neither case was a conflict of interest established under similar circumstances. In <u>Walton</u>, we concluded it was error to permit a doctor who previously assisted in the preparation of a codefendant's defense strategy to testify on behalf of the State during the defendant's postconviction evidentiary hearing. 847 So. 2d at 445-46. In <u>Sanders</u>, we concluded the trial court erred in permitting a doctor who had previously been in possession of numerous documents and received communications about the defendant to testify on behalf of the State during the penalty phase. 707 So. 2d at 668-69. However, Williams never asserted that Dr. Brannon previously worked for him or was in possession of materials related to his case. The relationship that existed was between Dr. Brannon and initial trial counsel, not Dr. Brannon and Williams. Because Williams has not established a direct conflict of interest between himself and Dr. Brannon, this claim is without merit.

**Intellectual Disability**

Williams asserts that the postconviction court erred when it denied his claim that he is intellectually disabled and therefore ineligible to be executed under the Eighth Amendment to the United States Constitution and <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002). We have explained:

> "Florida law includes a three-prong test for intellectual
> disability as a bar to imposition of the death penalty." <u>Snelgrove v.</u>

State, 107 So. 3d 242, 252 (Fla. 2012).  A defendant must establish intellectual disability by demonstrating the following three factors: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.  See Hurst v. State, 147 So. 3d 435, 441 (Fla. 2014) rev'd, Hurst v. Florida, 136 S. Ct. 616 (2016); § 921.137(1), Fla. Stat.  The defendant has the burden to prove that he is intellectually disabled by clear and convincing evidence.  Franqui v. State, 59 So. 3d 82, 92 (Fla. 2011); § 921.137(4), Fla. Stat.  If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled.  Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009).  In reviewing intellectual disability determinations, this Court has employed the standard of whether competent, substantial evidence supports the trial court's determination.

Salazar v. State, 188 So. 3d 799, 811-12 (Fla. 2016).  We will not reweigh the evidence or second-guess the findings of the lower court with regard to the credibility of witnesses.  Snelgrove v. State, 107 So. 3d 242, 252 (Fla. 2012).

The postconviction court carefully considered and evaluated, under the applicable law at the time,[3] each of the three prongs of the intellectual disability

---

3. After the postconviction court entered its order holding that Williams failed to establish he is intellectually disabled, the United States Supreme Court issued Hall v. Florida, 134 S. Ct. 1986, 2001 (2014), which clarified that the standard error of measurement must be considered in determining whether an individual has met the "significantly subaverage general intellectual functioning" prong of the determination.  Because the postconviction court concluded that Williams failed to meet all three prongs of the intellectual disability standard, and we conclude that competent, substantial evidence supports the court's conclusion that Williams failed to establish the second prong of the standard, Hall does not alter the outcome of this case.  To remand this claim for reconsideration in light of Hall would not change the fact that Williams failed to establish the second and third prongs of the intellectual disability standard and is therefore not entitled to relief.  Further, it would disregard the significant effort by the postconviction court

- 18 -

standard.  The court concluded Williams failed to establish that he met any of the three prongs by clear and convincing evidence.  In this analysis, we focus on the second prong and conclude the postconviction court's finding that Williams failed to demonstrate that he suffers from concurrent deficits in adaptive behavior is supported by competent, substantial evidence.  Therefore, Williams is not entitled to relief.  See Salazar, 188 So. 3d at 812 ("If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled.").

The term "adaptive behavior," as used in section 921.137(1), Fla. Stat. (2013), "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community."  To demonstrate deficits in adaptive behavior, a defendant must show significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  See Atkins, 536 U.S. at 308 n.3.  In evaluating adaptive deficits,

> the trial court does not weigh a defendant's strengths against his limitations in determining whether a deficit in adaptive behavior exists.  Rather, after it considers "the findings of experts and all other evidence," Fla. R. Crim. P. 3.203(e), it determines whether a

in evaluating and weighing the extensive evidence presented with regard to this claim.

defendant has a deficit in adaptive behavior by examining evidence of a defendant's limitations, as well as evidence that may rebut those limitations.

Dufour v. State, 69 So. 3d 235, 250 (Fla. 2011).

As a threshold matter, Williams asserts that the postconviction court abused its discretion in allowing Dr. Gregory Prichard to testify during the evidentiary hearing as an expert in the field of intellectual disability. Williams contends that Dr. Prichard was not qualified to render an opinion regarding intellectual disability because: (1) his degree is a Doctorate of Psychology (Psy.D.), which requires less research than a Doctorate of Philosophy (Ph.D.); (2) he is not affiliated with a university; and (3) he does not conduct research and has never published an article in a peer-reviewed journal. The determination of the qualifications of a witness to express an expert opinion falls within the discretion of the postconviction court, and that decision will not be reversed absent clear error. See Floyd v. State, 913 So. 2d 564, 575 (Fla. 2005).

The testimony presented at the evidentiary hearing established that Dr. Prichard has been a licensed clinical psychologist in Florida since 1996, with a subspecialty in forensic psychology and a specialization in assessing for intellectual disability. He conducts an average of two or three intellectual disability assessments per week, and has conducted at least two thousand intellectual disability assessments over the course of his career. At least a few

hundred of those assessments were done in capital cases. Dr. Prichard is a member of the American Association on Intellectual and Developmental Disabilities, the Florida Psychological Association, and the American Psychological Association. He has been deemed an expert many times in courts throughout Florida, and no court has ever refused to allow Dr. Prichard to render an expert opinion in the field of psychology on the issue of intellectual disability.

Section 90.702, Florida Statutes (2012), provides that a witness may be qualified as an expert based on knowledge, skill, experience, training, or education. Research, university affiliation, and publication are not prerequisites to qualification as an expert. Based upon Dr. Prichard's specialized knowledge and extensive experience in evaluating individuals for intellectual disability, we conclude that the postconviction court acted well within its discretion in qualifying Dr. Prichard as an expert in the field of psychology and intellectual disability.

As to the merits of Williams's claim, Dr. Mark Tassé, a psychology professor specializing in intellectual disability, testified during the evidentiary hearing that there are multiple standardized tests for assessing adaptive behavior. One such test is the Adaptive Behavior Assessment System (ABAS). The ABAS assesses ten skill areas: communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, social, and work. These skill areas are incorporated into three domains: the conceptual domain, the

social domain, and the practical domain.  The scores taken from the three domains are then used to determine the total score.

The ABAS was developed by Dr. Thomas Oakland, another expert retained by Williams.  Dr. Oakland administered the ABAS to Williams.  However, when asked about the validity of ABAS testing on individuals in the prison setting, Dr. Oakland stated:

> Well, one must realize that Mr. Williams is incarcerated in a setting that provides considerable confinement . . . .  [There] are very few things that he is allowed to decide to do on his own.  Which makes the assessment of adaptive behavior irrelevant.  It's silly.  Down right [sic] silly to try to acquire adaptive behavior information on persons who are incarcerated under those conditions.

Dr. Oakland further explained that because people within a prison setting are highly restricted as to the behaviors they can display, "we are not going to get an accurate assessment of adaptive behavior by . . . acquiring information on prison related behaviors."  Drs. Tassé, Woods, and Prichard all agreed that the ABAS is not especially useful in assessing the adaptive behavior of a person who has been incarcerated for an extended period of time.

Williams's self-reported responses on the ABAS indicated that he was deficient in nine out of the ten skill areas.  In those nine skill areas, Williams received the lowest possible score.  When asked about the meaning of the results, Dr. Oakland said, "Well, it tells me that [Williams's] display of adaptive behavior in a prison setting is very, very restricted.  But we know that.  So it merely

confirms the fact statistically and through measurement of behaviors that we recognize prevail in a prison setting." Essentially, Dr. Oakland's opinion was that the results of Williams's ABAS were not an accurate assessment of his adaptive functioning.

Dr. Prichard also disputed the validity of Williams's ABAS results. Williams indicated on the ABAS that he is not capable of ordering his own meal at a restaurant, finding a restroom in a public place, or looking both ways before crossing a street. According to Dr. Prichard, the extremely low scores Williams received on the ABAS would place him in the moderate-to-severe range of intellectual disability, which comprises the lowest fifteen percent of all intellectually disabled individuals. Dr. Prichard testified that a person with adaptive functioning so low as to not be able to find a restroom in a public place may have to be institutionalized.

Further, Dr. Prichard concluded that Williams's self-reported data was not reliable in light of his history. Williams held various jobs, including in the dietary department of a hospital, and at restaurants and grocery stores. Williams also obtained a driver license and informed Dr. Prichard that he would sometimes walk to work or take the bus. Although Williams indicated on the ABAS that he could not provide the correct amount of money for a purchase under ten dollars, he was able to successfully multiply 809 by 47 and subtract $5.70 from $62.00 during an

administration of the Wide Range Achievement Test. He also informed Dr. Prichard that he managed his own money. Williams stated that he maintained a savings account and would deposit money in the bank, while keeping some for himself. Moreover, Williams obtained his General Educational Development (GED) diploma. Dr. Prichard testified that he has not encountered an intellectually disabled person who can pass even a single section of the GED test, let alone the entire examination.

Dr. Oakland also administered the ABAS to Williams's half-sisters, Clinita and Althamease, who provided data regarding Williams's adaptive behavior prior to the age of eighteen. Under Florida law, however, adaptive deficits must be current. See Hodges v. State, 55 So. 3d 515, 534 (Fla. 2010). Thus, the information provided by Clinita and Althamease is insufficient to satisfy the second prong of the intellectual disability test because it does not address Williams's current adaptive behavior. See Phillips v. State, 984 So. 2d 503, 511 (Fla. 2008). Further, Dr. Oakland acknowledged on cross-examination that the information provided by Althamease, who is seven years younger than Williams, was based on observations she made over thirty years ago when she was only nine or ten years old, and therefore her ABAS results may have been even more limited in their meaning.

Even assuming the relevancy of the ABAS results provided by Clinita and Althamease, the validity of the results was disputed by Dr. Prichard. He testified that family members often give information that is not objective and not useful because they are motivated by their love for the individual and a desire for a particular outcome. On the ABAS completed by Clinita, she scored Williams as deficient in nearly every skill area assessed and placed Williams's functioning at the age of a five- to seven-year-old. These results indicated that Williams basically had no independent skills in those areas. Dr. Prichard again noted that some individuals with such extreme adaptive deficits have to be institutionalized.

Dr. Prichard found that the scores Clinita gave on the ABAS were completely inconsistent with the testimony she had given during the two trials. During Williams's first trial for Dyke's murder, Clinita testified that after her and Williams's mother died in childbirth, she and her younger half-siblings were homeless and living in an abandoned car, and it was Williams who took care of the other children while she worked. Clinita testified that Williams "became the person . . . who had to help me strengthen . . . he went from the person who was the youngest to the person who then became the oldest." During the retrial, Clinita testified that Williams helped her sell bottles and cans to supplement the family income. According to Clinita, Williams did whatever he could to help, including searching for food and raising the other children. Based on these inconsistencies

and what Dr. Prichard knew about Williams, he concluded that the information Clinita provided on the ABAS was "exaggerated to the point of being absurd." Dr. Prichard concluded that, because valid data was not provided, the results were likewise invalid.

Dr. Prichard also analyzed Williams's ability to think abstractly and rationalize his actions and their consequences. He found that Williams's conduct during and after the Jeffrey murder reflected planning and forethought, which is normally beyond the capabilities of an intellectually disabled person. Williams entered the Jeffrey house while everyone was asleep, stabbed Gaynel Jeffrey to death, used her mother's vehicle to dispose of the body at a construction site, and then returned the vehicle to the house. According to Dr. Prichard, such actions demonstrate that Williams recognized his situation and took steps to cover his actions.

Further, although most intellectually disabled people think in concrete terms, when questioned about the Jeffrey murder, Williams told police that he killed Gaynel Jeffrey in self-defense. After the Dyke murder, Williams explained the cuts on his fingers by claiming he cut himself while washing dishes. According to Dr. Prichard, Williams's ability to know what type of information the police were seeking and then fabricate explanations to cover up the truth constitute abstract

- 26 -

thinking that is usually beyond the capabilities of a person who is intellectually disabled.

The postconviction court found Williams's ABAS results were insufficient to support his allegation that he suffers from deficits in adaptive functioning. Because Dr. Oakland concluded Williams's ABAS scores merely confirmed the fact that his adaptive behavior in prison was extremely restricted, which he said renders "the assessment of adaptive behavior irrelevant" and "silly," the postconviction court declined to "attach more meaning to the ABAS score . . . than [Williams's] own expert did." The postconviction court also agreed with Dr. Prichard that Williams's history of employment, driving, managing his money, and obtaining a GED diploma all contradicted the ABAS scores and rebutted his allegations of deficits in adaptive behavior.

Competent, substantial evidence supports the postconviction court's ruling that Williams does not suffer from deficits in adaptive functioning. Dr. Prichard explained why Williams's scores on the ABAS were not credible. Williams himself described behaviors to Dr. Prichard that were inconsistent with his responses on the ABAS, such as managing money, taking the bus, shopping for groceries, and purchasing household items and clothing for himself. Each of these abilities directly rebuts Williams's indication on the ABAS that he cannot find a restroom in a public place or provide the correct amount of money for a purchase

under ten dollars. The record further reflects that Williams worked as a cook, a sandwich maker, and a server in restaurants, which rebuts Williams's report on the ABAS that he is not capable of ordering his own meal at a restaurant. Williams had a driver license and walked to work, both of which rebut his self-report on the ABAS that he is not capable of looking both ways before crossing a street.

Further, Williams's efforts to conceal his involvement and culpability in the murders of Gaynel Jeffrey and Lisa Dyke also contradict his claim of deficient adaptive functioning. See Phillips, 984 So. 2d at 512 (concluding that the defendant's ability to plan and cover-up the murder was inconsistent with a finding of deficient adaptive functioning). Moreover, the fact that Williams successfully obtained his GED diploma supports the conclusion that he does not suffer from adaptive deficits. See Dufour, 69 So. 3d at 250.

We recently reiterated that "[i]f the defendant fails to prove any one of the[] components [delineated in section 921.137(1), Florida Statutes], the defendant will not be found to be intellectually disabled." Salazar, 188 So. 3d at 812. Because competent, substantial evidence supports the postconviction court's conclusion that Williams failed to establish the second prong of the intellectual disability standard, we affirm the determination that Williams does not qualify as intellectually disabled under Florida law.

## Hurst

During the pendency of Williams's appeal from the denial of his motion for postconviction relief, the United States Supreme Court issued Hurst v. Florida, in which it held that Florida's former capital sentencing scheme was unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." 136 S. Ct. at 619. On remand in Hurst, we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

202 So. 3d at 57. In Mosley, we concluded that Hurst applies retroactively to those defendants whose sentences became final after the Supreme Court decided Ring. 209 So. 3d at 1283. In light of the non-unanimous jury recommendation to impose a sentence of death, it cannot be said that the failure to require a unanimous verdict here was harmless. See, e.g., Hodges v. State, 213 So. 3d 863, 881 (Fla. 2017).

## CONCLUSION

For the reasons stated above, we affirm the postconviction court's order denying Williams postconviction relief, with the exception of the ineffective assistance of penalty phase counsel claim, which we do not address. However,

pursuant to Hurst and Mosley, we vacate Williams's sentence of death and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

CANADY, J., concurring in part and dissenting in part.

I concur with the majority that Williams is not entitled to relief from his conviction on his constitutional challenges to section 27.7081, Florida Statutes (2008), and Florida Rule of Criminal Procedure 3.852, his claim of ineffective assistance of counsel at his first trial in 1996, his claim of a conflict of interest with Dr. Brannon, or his intellectual disability claim. But I dissent from the decision to vacate Williams's death sentence and remand for a new penalty phase. I would also reject Williams's claim of ineffective assistance of counsel at the penalty phase of his 2004 retrial. Therefore, I would affirm the denial of postconviction relief.

- 30 -

First, I would conclude that there was no error under <u>Hurst v. Florida</u>, 136 S.

Ct. 616 (2016).  I adhere to my view that <u>Hurst v. Florida</u> only requires that the

jury find the existence of an aggravating circumstance that renders a defendant

eligible for a death sentence.  <u>See</u> <u>Hurst v. State</u>, 202 So. 3d 40, 77 (Fla. 2016)

(Canady, J., dissenting) (noting "the <u>Hurst v. Florida</u> Court's repeated

identification of Florida's failure to require a jury finding of an aggravator as the

flaw that renders Florida's death penalty law unconstitutional"), <u>cert. denied</u>, No.

16-998, 2017 WL 635999 (U.S. May 22, 2017); <u>see also</u> <u>Hurst v. Florida</u>, 136 S.

Ct. at 624 ("Florida's sentencing scheme, which required the judge alone to find

the existence of an aggravating circumstance, is therefore unconstitutional.").  But

here, because Williams had twice previously been convicted of violent felonies

(the second-degree murder of Gaynel Jeffrey in 1984 and an indecent assault upon

a nine-year-old girl in 1982), it was not even necessary for the jury to make a

unanimous finding regarding the existence of an aggravating circumstance.  This

Court has recently reaffirmed that it will follow the Supreme Court's precedent

creating "one narrow exception to the Sixth Amendment requirement that a jury

must find any fact that increases the maximum sentence: the fact of a prior

conviction, as established in <u>Almendarez-Torres</u>[ <u>v. United States</u>, 523 U.S. 224

(1998)]."  <u>Jackson v. State</u>, 213 So. 3d 754, 787 (Fla. 2017) (citing <u>Ring v.</u>

Arizona, 536 U.S. 584, 597 n.4 (2002); Apprendi v. New Jersey, 530 U.S. 466, 489-90 (2000)).  Thus, I would conclude that no Hurst v. Florida error occurred.

Second, I adhere to my view that Hurst v. Florida should not be given retroactive application.  See Mosley v. State, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part).  Even if Hurst v. Florida error were present in this case, I would deny Williams relief.

Finally, I would conclude that the postconviction court did not err in denying Williams's claim that he received ineffective assistance of counsel during the penalty phase of his retrial.

For these reasons, I would affirm the denial of postconviction relief.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Broward County,
    Eileen M. O'Connor, Senior Judge - Case No. 061993CF003005A88810

Neal A. Dupree, Capital Collateral Regional Counsel, Nicole M. Noël, Assistant Capital Collateral Regional Counsel, and Marta Jaszczolt, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee